**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED APRIL 24, 2001**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                       No. 115225

FREDERICK G. ATTEBURY, JR.,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

We granted the prosecutor's application for leave to appeal to consider the propriety of the trial court's application of the "public safety" exception to *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). Because we conclude that the circumstances of this case fall within the rule of *New York v Quarles*, 467 US 649; 104 S Ct

2626; 81 L Ed 2d 550 (1984), we reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

I. Factual and Procedural Background

On January 19, 1996, defendant approached his estranged wife in a shopping center parking lot in Marysville and threatened to shoot her. After explaining that he had a gun, defendant ordered his wife into the driver's seat of her car. He then displayed a handgun he had tucked into his pants and forced his way into the back seat of her car before his wife could drive away. Fearing for her life, defendant's wife fled on foot to a nearby video store and promptly called the police. When the police arrived minutes later, defendant had left the area.

Defendant's wife filed a complaint and the police obtained a warrant for defendant's arrest on a charge of assault with a dangerous weapon, MCL 750.82; MSA 28.277. Two days after the incident in the parking lot, three police officers went to defendant's apartment to execute the warrant for his arrest. In addition to information in the arrest warrant regarding the nature of the alleged offense, the officers knew that defendant had recently been treated for mental problems at a local hospital. Officer Larry West testified as follows at defendant's suppression hearing:

2

We knew that prior to this incident taking place on or about the 18th, which would have been the night before the alleged assault, there was a broadcast put on the police radio with Mr. Attebury's name attached to it, that the psychiatrist had alerted the police he was homicidal at that point or had homicidal thoughts.

Using a key provided by the landlord, the officers entered defendant's apartment without knocking. Once inside the apartment, they discovered that defendant was taking a shower. Officer West described the officers' initial interaction with defendant:

Q. Tell the Judge briefly what transpired in or around the bathroom area of the shower.

A. After we entered the home, it was to our left. I knocked on the door, advised him who we were, why we were there. He was given permission to continue his shower.

After he finished he went to get dressed. We showed him the warrant. While he was getting dressed, because he was going in and out of a dresser and what not, we asked him whether there were weapons in the home. He said that there wasn't.

Q. Did he tell you—what are the things that he told you with regard to questions you asked him about the weapon? Tell the Judge what the questions were and what his answers were?

A. Whether there were weapons in the home, he said not at this time. And we asked him because there was a weapon indicated in the warrant if he had that weapon there or where it was at. He indicated to me at that time he had taken it to his brother's house.

Q. And did you later locate a weapon at the brother's house?

3

*A.* Yes, we did.

*Q.* Were it not for his statement to you as to the location of that weapon, do you think you would have tracked it down, it being at the brother's house by other means?

*A.* That would have been doubtful.

*Q.* Okay. Did you know before asking the question about the weapon whether he had the weapon in the home or what he had done with the weapon?

*A.* No. We had no idea where the weapon was at that time.

*Q.* What was your concerns [sic] with regard to that weapon? What concerns?

*A.* The fact of not knowing Mr. Attebury. Not knowing him. There were three police officers in his room. We are certain that he allegedly threatened to kill one person and he would have access to a weapon. We didn't know where one was, if he had thrown it in the ditch or river, if he had it stashed somewhere in his home, if he had a person who was hiding when he heard us come in, any of those scenarios that have come up.

It is undisputed that the police did not advise defendant of his *Miranda* rights before asking about the gun. When the officers later informed defendant of his rights, defendant again explained that he had given the gun to his brother.

Faced with the charge of assault with a dangerous weapon, MCL 750.82; MSA 28.277, defendant moved to suppress his initial statement to the police and the gun on the ground that his federal constitutional rights had been violated. Defendant argued that his statement regarding the whereabouts

4

of the gun was unlawfully obtained in violation of the *Miranda* rule, and that the gun itself was the "fruit of the poisonous tree," see *Wong Sun v United States*, 371 US 471, 488; 83 S Ct 407; 9 L Ed 2d 441 (1963). After an evidentiary hearing, the trial court denied defendant's motion on the ground that the facts fell within the public safety exception set forth in *Quarles*. At trial, Officer West testified specifically about defendant's statement in the apartment regarding the location of the gun described in the arrest warrant. A jury convicted defendant as charged and the trial court sentenced him to a two-year term of probation.

The Court of Appeals, over a dissent, reversed defendant's conviction and remanded for a new trial.[1] The majority concluded that the facts of this case were "markedly and significantly different" from the situation in *Quarles*, because the police were "not confronted with an immediate threat to the public." Given the "unthreatening" circumstances under which the police first encountered defendant and the fact that the police had no "indication that the gun was located in a place where it was endangering the public," the majority reasoned that "the police were not confronted with a situation where they had to make a split

[1] Unpublished opinion per curiam, issued April 13, 1999, reh den June 21, 1999 (Docket No. 197053).

5

second decision between giving *Miranda* warnings and neutralizing a volatile danger to public safety." Rather, "the questioning of defendant was clearly investigatory and did not relate in any way to an objectively reasonable concern for public safety." Accordingly, the majority concluded that the "type of exigent circumstances that justify application of the narrowly tailored public safety exception to the *Miranda* rule were not present in the case at hand." The majority ruled that the defendant's statement should have been suppressed because it was obtained in violation of the *Miranda* rule, and that the gun should have been suppressed "given that its discovery was the illegal fruit of the *Miranda* violation."

In the dissenting judge's view, the circumstances of the case, including the nature of the alleged offense and defendant's homicidal tendencies, gave the arresting officer "an objectively reasonable justification to question defendant regarding the whereabouts of the gun before instructing defendant regarding his *Miranda* rights." In particular, he opined that "while one might question the wisdom of the officer's decision to grant defendant the liberty to dress himself without restraint, the exigency justifying the officer's question, e.g., the safety of the arresting officers, was nonetheless present when the officer questioned defendant regarding the location of the gun that was used to

6

commit the crime named in the warrant." The dissent concluded that "under the circumstances of this case, the questions posed to defendant by the arresting officer were reasonably prompted by a concern for the safety of the officers, and therefore, the questions come within the exception to the *Miranda* rule recognized in *Quarles*." The dissenting judge would have affirmed.

## II. STANDARD OF REVIEW

We review a trial court's factual findings in a ruling on a motion to suppress for clear error. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo. See *People v Daoud*, 462 Mich 621, 629-630; 614 NW2d 152 (2000); *People v Stevens (After Remand)*, 460 Mich 626, 631; 597 NW2d 53 (1999).

## III. THE *MIRANDA* RULE AND THE *QUARLES* PUBLIC SAFETY EXCEPTION

In its landmark *Miranda* decision, the United States Supreme Court announced the general rule that the prosecution in a criminal case may not use a statement "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. As a basis for the rule, the *Miranda* Court explained that in

7

order to effectively combat the "inherently compelling pressures" of custodial interrogation, an accused must be "adequately and effectively apprised" of rights associated with the interrogation. *Id*. at 467. In the years since *Miranda*, the United States Supreme Court has repeatedly described the required advice of rights as being a "prophylactic" measure designed to protect the exercise of an accused's Fifth Amendment rights. See *Dickerson v United States*, 530 US 428, ___, n 2; 120 S Ct 2326, 2333, n 2; 147 L Ed 2d 405 (2000) (citing cases). Although some of these decisions, including *Quarles,* might have been read to suggest that *Miranda* warnings are not constitutionally required,[2] the Court has recently confirmed that the *Miranda* decision "announced a constitutional rule." *Dickerson*, 120 S Ct 2336. In so doing, however, it also explained that the *Miranda* rule was not "immutable." 120 S Ct 2335. Most notably, for purposes of this case, *Dickerson* described the *Quarles* public safety exception as merely being a "modification" of the *Miranda* rule. *Id*. Accordingly, *Quarles* remains "good law" after *Dickerson*.

---

[2] For instance, in *Quarles, supra* at 654, the Court quoted *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed 2d 182 (1974), for the proposition that the "prophylactic" *Miranda* warnings are "not themselves rights protected by the Constitution, but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected."

8

In *Quarles,* a woman approached a police officer alleging that she had just been raped by an armed man.  She described her assailant and told the officer that the man had gone into a nearby grocery store.  Entering the store, the officer saw the suspect, who turned and ran toward the rear of the store.  The suspect was briefly out of the officer's sight.  When the officer apprehended the suspect a moment later, the officer frisked the man and discovered that he was wearing an empty shoulder holster.  The officer then handcuffed him and—without giving *Miranda* warnings—inquired about the location of the gun.  The suspect nodded toward some cartons and said that it was "over there."  Subsequently, the gun was found and the suspect was charged with criminal possession of a weapon.

The issue before the *Quarles* Court was whether the officer "was justified in failing to make available to respondent the procedural safeguards associated with the privilege against compulsory self-incrimination since *Miranda.*"  *Quarles, supra* at 655.  The Court answered this question in the affirmative, concluding that "overriding considerations of public safety" justified the officer's failure to provide *Miranda* warnings before asking "questions devoted to locating the abandoned weapon."  *Id.* at 651.  It then explained that the *Miranda* rule does not apply "in all its rigor" to situations involving police questions

"reasonably prompted by a concern for the public safety." *Id.* at 656.

In defining, more precisely, the parameters of the public safety exception, the Court first rejected the notion that the availability of the public safety exception should depend on the subjective motivation of the officers involved:

> In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer. [*Id.* at 656.]

The Court also suggested that application of the public safety exception was limited to situations involving an "immediate" public safety concern. *Id.* at 657, 658, n 8. It described the exigency faced by the arresting officers in *Quarles* as follows:

> So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it. [*Id.* at 657.]

Although the *Quarles* Court repeatedly referred to "public safety," its use of the phrase "public safety" clearly encompassed the safety of the officers as well as the general public. See *id.* at 658-659, n 8. Finally, the Court drew a specific distinction between questions objectively necessary

10

to secure the public safety and those with an investigatory purpose, explaining that only the former can trigger application of the public safety exception. Distinguishing *Quarles* from its earlier decision in *Orozco v Texas*, 394 US 324; 89 S Ct 1095; 22 L Ed 2d 311 (1969), the Court explained:

> In *Orozco* four hours after a murder had been committed at a restaurant, four police officers entered the defendant's boardinghouse and awakened the defendant, who was sleeping in his bedroom. Without giving him *Miranda* warnings, they began vigorously to interrogate him about whether he had been present at the scene of the shooting and whether he owned a gun. The defendant eventually admitted that he had been present at the scene and directed the officers to a washing machine in the backroom of the boardinghouse where he had hidden the gun. We held that all the statements should have been suppressed. In *Orozco*, however, *the questions about the gun were clearly investigatory; they did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon.* In short there was no exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime. [*Id.* at 659, n 8 (emphasis added).]

The preceding excerpt nicely captures the relevant elements of the *Quarles* public safety exception: for it to apply, the police inquiry must have been an objectively reasonable question necessary to protect the police or the public from an immediate danger.

IV. APPLICATION OF THE PUBLIC SAFETY EXCEPTION

This case presents the first occasion we have had to apply the *Quarles* public safety exception to *Miranda*. As an

11

initial matter, the parties agree that defendant was in custody at the time of Officer West's questions. At the suppression hearing, West testified that defendant was "in custody" and had no right to leave. Moreover, defendant does not contend that his statements to the police were anything less than completely voluntary. Defendant voluntarily answered the officer's questions, knowing that the police were in his apartment to execute a warrant for his arrest in connection with the threats he made against his wife. Accordingly, there was no due process violation, see *Spano v New York*, 360 US 315; 79 S Ct 1202; 3 L Ed 2d 1265 (1959), and no violation of the express language of the Fifth Amendment self-incrimination clause, see generally *Oregon v Elstad,* 470 US 298, 304-309; 105 S Ct 1285; 84 L Ed 2d 222 (1985); see also *Daoud*, *supra* at 637 (recognizing that "the Fifth Amendment itself protects only against *compelled* self-incrimination").

With respect to application of the public safety exception itself, we agree with the analysis of the Court of Appeals dissent. The Court of Appeals majority erred by limiting application of the public safety exception to questions necessary to protect the public *other than* the police themselves. See *Quarles*, *supra* at 658-659, n 8. It also erred in concluding that the situation did not pose an

immediate danger.  Viewed in an objective fashion as *Quarles* requires, once the officers allowed defendant to dress, and defendant began to rummage through his dresser drawers, any reasonable person in the officers' position would have been concerned  for his own immediate safety.  Not only did the officers know that the arrest warrant stemmed from an incident in which defendant threatened his wife with a gun, but they also knew that defendant had previously expressed homicidal and suicidal thoughts.[3]  While the officers might have, in hindsight, mitigated the exigency by physically restraining defendant before he was allowed to dress, their failure to do so does not alter our analysis.  The fact remains that an exigency existed.  The logic underlying *Quarles* is based on the existence, rather than the cause of, a "public safety" exigency.

Finally, contrary to defendant's argument, the United States Supreme Court's decision in *Orozco, supra,* does not command a different result.  There, as noted above in the

---

[3]  Compare *United States v DeSantis*, 870 F2d 536 (CA 9, 1989) (concluding that the exception applied where the police questioned the defendant regarding the presence of weapons in a bedroom of an otherwise unoccupied apartment in response to the defendant's request to change into clothes located in that bedroom), with *United States v Mobley*, 40 F3d 688 (CA 4, 1994) (concluding that the exception did not apply where the police encountered the naked defendant alone in his apartment, had performed a security sweep, and inquired regarding the presence of weapons as they were leading the defendant away).

excerpt from *Quarles*, *supra* at 659, n 8, the sleeping suspect was awakened only after being surrounded by four police officers. He was then questioned vigorously while he remained in bed. Under the circumstances, the officers' questions "did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." *Id.* Here, however, defendant easily could have hidden the weapon in one of the dresser drawers to which he had immediate access. Thus, as in *Quarles* rather than *Orozco*, the officers' initial attempts to ascertain the location of the gun were directly related to an objectively reasonable need to secure protection from the possibility of immediate danger associated with the gun. Moreover, the pre-*Miranda* questioning in the present case related solely to neutralizing this danger. The officers only asked about the whereabouts of the gun and not other broader questions relating to investigation of the crime. This case is thus unlike *Orozco*, where the pre-*Miranda* questioning included general investigation, such as whether the suspect was at the scene of the crime, which was unrelated to any immediate danger to the officers or the public. Here, once the officers were satisfied that defendant posed no immediate threat of danger to them, they informed defendant of the *Miranda* rights and began their general investigation. For all

of these reasons, the pre-*Miranda* questioning at issue in this case falls squarely within the public safety exception to *Miranda.*

In sum, we hold that the officers were justified in forgoing immediate adherence to the *Miranda* rule, given the exigencies of the situation in defendant's apartment at the time of his arrest.  Accordingly, the trial court did not err in refusing to suppress defendant's statement or the gun.  The judgment of the Court of Appeals is reversed and the judgment of the circuit court is reinstated.

WEAVER, TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, C.J.

CAVANAGH and KELLY, JJ., concurred in the result only.