# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

RICHARD ALLAN McKENZIE, JR.,

Defendant-Appellee.

UNPUBLISHED
June 16, 2016

No. 328740
Mackinac Circuit Court
LC No. 15-003602

Before: MARKEY, P.J., and OWENS and BOONSTRA, JJ.

PER CURIAM.

Plaintiff appeals by leave granted[1] from the trial court order granting defendant's motion to suppress a number of statements he made both before and after he was advised of his *Miranda*[2] rights. We affirm in part and reverse in part.

## I. FACTS

This case arises from the murder of Richard Allan McKenzie Sr., defendant's father. Responding to a report regarding an incident between a father and son, Michigan State Police troopers found defendant lying unconscious on the cement floor of a pole barn. Defendant was not wearing any pants and had severe lacerations on his arms and upper body. Trooper John Ferguson testified that because of defendant's physical appearance, he believed that defendant was the father. When EMTs arrived, Ferguson left the pole barn to secure the scene as EMTs awakened defendant. Defendant was sitting up on the gurney and receiving medical attention when Ferguson returned to the pole barn.

In the process of attempting to ascertain defendant's identity, Trooper Ferguson called defendant "Dick" because he had been informed that the father went by "Dick" and that the son went by "Rick." When defendant told the trooper that he was Rick, Ferguson asked where his

---

[1] *People v McKenzie*, unpublished order of the Court of Appeals, entered December 4, 2015 (Docket No. 328740).

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

father was. Defendant said that he was dead inside the house. Defendant told the trooper that he, defendant, had shot his father. Another trooper then went into the house to determine if the information provided by defendant was true. Ferguson stayed in the pole barn with defendant. When Ferguson confirmed for defendant that his father was dead, defendant said that he was glad and that he had accomplished his mission. Defendant was then placed into an ambulance to be transported to the hospital. Ferguson rode in the ambulance with defendant.

An audio recording captured statements made by defendant in the ambulance and at the hospital before he was advised of his *Miranda* rights. Defendant's statements provided details of the crime as well as a motive. Defendant said that he had intended to commit suicide when he "ate all the pills [he could]." When an emergency room doctor asked defendant if he had been drinking, defendant stated that he had "a little bit" and then said, "I just wanted him dead."

As Trooper Ferguson was attempting to get defendants' attention and explain to him that he needed to read defendant his *Miranda* rights, defendant said, "I could have shot my fucking self after I killed my dad." Defendant then asked, "Is he dead?" and Ferguson replied, "Yes, he is, Rick." Defendant said, "Thank me. I love it. You know, that's what my mission was." Ferguson interrupted defendant again in an attempt to advise him of his rights, but defendant ignored the trooper and said, "I did not think about doing this until that night when my old lady pissed me off." Defendant then became silent and Ferguson was able to read the *Miranda* rights. Thereafter, Ferguson began to question defendant about the shooting and defendant's motive. Defendant again admitted that he shot his father and provided details of the shooting as well as a motive.

Defendant moved to suppress the statements he made in the pole barn, in the ambulance, and at the hospital. At the hearing on the motion, Trooper Ferguson testified that his initial conversation with defendant was intended to ascertain defendant's identity and determine "who the players were" in the situation. He testified that defendant was merely a person of interest after he stated that he had shot his father until it could be determined whether a crime had, in fact, been committed. Ferguson said that defendant was not free to leave after it was determined that his father was dead. Ferguson testified that he did not question defendant until after *Miranda* warnings were given at the hospital.

An expert in toxicology and pharmacology testified that defendant's blood alcohol level at 11:18 p.m. was 0.20, and that a urine test revealed the presence of opiates and benzodiazepines, all of which were consistent with defendant's statement that he had consumed morphine, Dilaudid, and valium. The expert stated that he could not state the extent to which a person with a 0.20 blood alcohol level who tested positive for opiates and benzodiazepines would be able to understand and waive his *Miranda* rights, but he opined that the alcohol and drugs would "certainly affect his capability to do so." According to the expert, such a person's judgment would definitely be impaired.

The court found that Ferguson's "testimony suggests that his questioning of the Defendant was after he was placed on the gurney. The Trooper, to his credit, acknowledged that at the point the Defendant was placed on the gurney, the Defendant was 'not free to leave' and was a 'person of interest' . . . ." The court ruled as follows:

-2-

In this circumstance it is difficult, at best, to say that the Defendant had his wits about him on the night in question. He was found lying unconscious and partially clothed on the floor of a pole barn, with several lacerations about his body. When awoken by the EMTs, using a fist to the Defendant's chest, he began a rambling and less than coherent diatribe about his activities on the night in question. He was obviously intoxicated, and later learned to have consumed large amounts of medication. The whole time he was being questioned by the Troopers, he was receiving medical care for his issues. The tape recording of the Defendant clearly indicates he was shivering and crying throughout the time he was being transported to the hospital and continued after his arrival at the hospital. Further, his Miranda rights were not immediately read to him and his response to the same, when read his rights, was not audible on the tape recording.

Given all of the above facts, it is clear to this Court that the circumstances surrounding the taking of the Defendant's statements were not such that the Defendant was capable of knowingly or intelligently waiving his Miranda rights or able to voluntarily make a rational decision regarding the same. This was further supported by the testimony of the Defendant's expert in toxicology.

The court suppressed all of defendant's statements.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

The question of whether an individual was subject to custodial interrogation, and thus entitled to *Miranda* warnings, is a mixed question of law and fact. *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001). The trial court's factual findings underlying its conclusion that a defendant was in custody are reviewed for clear error, while the legal question on whether a defendant was in custody for purposes of *Miranda* is reviewed de novo. *People v Steele*, 292 Mich App 308, 313, 316; 806 NW2d 753 (2011). "A factual finding is clearly erroneous if it leaves the Court with a definite and firm conviction that the trial court made a mistake." *Id*.

We review de novo a trial court's determination that defendant's waiver of Miranda rights was knowing, intelligent, and voluntary. *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2000).

### B. UNDERLYING LAW

A defendant has a constitutional right to remain silent during custodial interrogation. *People v Henry (After Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014). Thus, statements made by a defendant during custodial interrogation are inadmissible at trial unless the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *People v Tierney,*

266 Mich App 687, 707; 703 NW2d 204 (2005). It is not necessary that a defendant understand the consequences and ramifications of waiving his rights but he must have a basic understanding of those rights. *Gipson*, 287 Mich App at 265. "Intoxication from alcohol or other substances can affect the validity of a waiver of Fifth Amendment rights, but is not dispositive." *Tierney*, 266 Mich App 707.

We bifurcate our analysis of this question by examining whether the defendant waived his *Miranda* rights (1) knowingly and intelligently and (2) voluntarily. *Id.* To determine whether a defendant knowingly and intelligently waived his *Miranda* rights, we examine the defendant's level of understanding of the waiver. *Gipson*, 287 Mich App at 265. In reviewing whether a defendant voluntarily confessed to a crime, this Court examines the totality of the circumstances and determines whether "the confession is 'the product of an essentially free and unconstrained choice by its maker,' or whether the accused's 'will has been overborne and his capacity for self-determination critically impaired . . . .' " *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988), quoting *Culombe v Connecticut*, 367 US 568, 602, 81 S Ct 1860, 6 L Ed 2d 1037 (1961). In determining voluntariness, factors to consider include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Cipriano*, 431 Mich at 334.]

## C. DEFENDANT'S STATEMENTS IN THE POLE BARN AND AMBULANCE

Plaintiff first argues that the trial court erred in finding that he was in custody and subject to custodial interrogation when he gave incriminating statements in the pole barn and ambulance. It is not disputed that Trooper Ferguson did not give defendant *Miranda* warnings until defendant was at the hospital.

*Miranda* warnings are not, however, required in every circumstance. An accused is not entitled to *Miranda* warnings unless he is subject to custodial interrogation. *People v Elliott*, 494 Mich 292, 302; 833 NW2d 284 (2013). "Generally, a custodial interrogation is a questioning initiated by law enforcement officers after the accused has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *Steele*, 292 Mich App at 316-317. To determine whether a defendant was in custody at the time of the interrogation, courts look at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he was not free to leave. *People v Roark*, 214 Mich App 421, 423; 543 NW2d 23 (1995). The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v California*, 511 US 318, 323; 114 S Ct 1526; 128 L Ed 2d 293 (1994). Police officers are not required to give *Miranda*

warnings "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977). General on-the-scene questions to investigate a crime do not implicate *Miranda. People v Ish*, 252 Mich App 115, 118; 652 NW2d 257 (2002).

When Ferguson initially encountered defendant he did not know defendant's identity, whether he was the victim, or that defendant's father lay dead in the house. At the hearing on the motion to suppress, Ferguson testified he was asking defendant questions in the attempt to ascertain defendant's identity and the location of others involved in the incident when defendant told him that his father was in the house, dead, and that defendant had shot him. Thus, Ferguson's initial questioning of defendant in the pole barn constituted general on-the-scene preliminary inquiries regarding a crime. See *People v Ridley*, 396 Mich 603, 609-610; 242 NW2d 402 (1976) (police were not required to give *Miranda* warnings to a defendant during the preliminary exploration of a "crime in progress"). Ferguson did not arrest defendant or engage in any conduct that deprived defendant of his freedom at that point, so Ferguson was not required to inform defendant of his *Miranda* rights. *Ish*, 251 Mich App at 118.

Even assuming that defendant was in custody at the time of Ferguson's inquiries, we conclude he was not subject to custodial interrogation. In assessing whether a police officer's statements or questions constitute an interrogation, "the dispositive question is whether the suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *People v McDonald*, 303 Mich App 424, 438; 844 NW2d 168 (2013) (internal quotation marks and citations omitted). But the Fifth Amendment does not bar the admission of volunteered statements of any kind. *People v Anderson*, 209 Mich App 527, 532; 531 NW2d 780 (1995).

When Ferguson asked defendant, "Where's Dick?" defendant said that he was in the house, that he was dead, and that he, defendant, had shot him. Ferguson's question about the location of defendant's father was not reasonably likely to elicit an admission from defendant that he shot and killed his father. Then, after it was confirmed that McKenzie Sr. was dead, Ferguson merely answered defendant's question about his father's condition. Defendant asked if his father was dead. Ferguson's response, "apparently so," was not reasonably likely to elicit defendant's incriminating response that he was glad and that he had accomplished his mission. *McDonald*, 303 Mich App at 438. Accordingly, the trial court erred by suppressing defendant's incriminating statements that were made in the pole barn and ambulance.

## D. WAIVER OF MIRANDA RIGHTS

### 1. VOLUNTARY WAIVER

Plaintiff argues that the trial court erred when it determined that defendant's *Miranda* waiver was involuntary without first finding evidence of police coercion or misconduct.

A suspect's waiver of his *Miranda* rights must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 US at 444. The United States Supreme Court has articulated a two-part inquiry to determine whether a waiver is valid:

First, the relinquishment of the right must have been voluntary, in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986) (citations and quotation marks omitted).]

"[W]hether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion." *People v Daoud*, 462 Mich 621, 635; 614 NW2d 152 (2000). "[T]he voluntariness prong cannot be resolved in [a] defendant's favor absent evidence of police coercion or misconduct." *People v Howard*, 226 Mich App 528, 543; 575 NW2d 16 (1997). The prosecution bears the burden of proving voluntariness by a preponderance of the evidence. *Daoud*, 462 Mich at 634.

The trial court found that defendant's intoxication and consumption of "large amounts of medication," as well as his ongoing medical treatment for "his issues," rendered him incapable "of knowingly or intelligently waiving his *Miranda* rights or able to voluntarily make a rational decision regarding the same." The trial court, however, failed to articulate any finding of police coercion or misconduct. Accordingly, the court committed a legal error when determining that defendant's *Miranda* waiver was involuntary. See *Daoud*, 462 Mich at 635.

## 2. KNOWING AND INTELLIGENT WAIVER

The prosecution argues that the trial court erred by finding that defendant's waiver of his *Miranda* rights was not knowing and intelligent.

With respect to whether a defendant's waiver of his *Miranda* rights was knowing and intelligent, a court will examine the defendant's level of understanding of the waiver. *Gipson*, 287 Mich App at 265. "A defendant does not need to understand the consequences and ramifications of waiving his or her rights." *Id*. Advanced intoxication by drugs or alcohol, however, may preclude an effective waiver of *Miranda* rights. *People v Davis*, 102 Mich App 403, 410; 301 NW2d 871 (1980).

Whether defendant was too intoxicated to comprehend his rights was a question of fact that the trial court was required to resolve at the *Walker*[3] hearing and which is accorded due deference on appeal. *People v Prast (On Rehearing)*, 114 Mich App 469, 484; 319 NW2d 627 (1982). "Credibility is crucial in determining a defendant's level of comprehension, and the trial court is in the best position to make this assessment," *People v Cheatham*, 453 Mich 1, 30; 551 NW2d 355 (1996), and this Court must give deference to the trial court's superior ability to

---

[3] *People v Walker*, 374 Mich 332; 132 NW2d 87 (1965).

judge the credibility of the witnesses, and will not reverse the trial court's factual findings unless they are clearly erroneous, *People v Tyner*, 497 Mich 1001; 861 NW2d 662 (2015).

The trial court found that it was difficult, at best, to find that defendant "had his wits about him" on the night of the incident. The court noted that defendant was found unconscious and partially clothed on the floor of a pole barn, with several lacerations on his body; he had to be awakened by EMTs using a fist to the chest. The court noted that defendant engaged in a rambling and less than coherent diatribe about his activities on the night in question, that he made statements while receiving medical care, and that he was shivering and crying while being treated at the hospital. The court also concluded that defendant was "obviously intoxicated" and later found "to have consumed large amounts of medication." The court found that in light of these facts, as well as the opinion of the toxicology expert, defendant was not capable of knowingly or intelligently waiving his *Miranda* rights.

The evidence in the record supported the trial court's finding that the circumstances surrounding the taking of defendant's statements were such that he was incapable of knowingly and intelligently waiving his rights. Blood drawn an hour after defendant was found unconscious in the pole barn showed that defendant had a blood serum level of 0.236, which equated to a blood alcohol content of 0.20, and urine tests showed concentrations of opiates and benzodiazepines in his system. An expert toxicologist testified that given these circumstances, defendant was likely unable to understand his *Miranda* rights and make a clear, knowledgeable decision about whether to waive them. Further, the trial court had the benefit of listening to the audiotape and defendant's responses as Ferguson was attempting to read him the *Miranda* rights.

In sum, the trial court erred by suppressing defendant's statements that were made in the pole barn and the ambulance. But the trial court did not clearly err finding that defendant did not knowingly and intelligently waive his *Miranda* rights and therefore suppressing the result of custodial interrogation after defendant was advised of his rights. *Tierney*, 266 Mich App 707.

We affirm in part and reverse in part. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Donald S. Owens