# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 25, 2017

Plaintiff-Appellee,

v

No. 328236
Allegan Circuit Court
LC No. 14-018840-FC

HOMER ROBERT CLAY,

Defendant-Appellant.

Before: SAWYER, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

Defendant, Homer Robert Clay, appeals as of right his convictions following a jury trial of possession of a dangerous weapon during the commission of a robbery (armed robbery), MCL 750.529, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and 2 counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 25 to 38 years' imprisonment for armed robbery, 5 to 15 years' imprisonment for felon-in-possession, and five years' imprisonment for both counts of felony-firearm. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from a gas station robbery on October 16, 2013. Hayden Durham was working at a gas station in Allegan County on the day of the robbery when a friend stopped by to visit around 2:30 p.m. While the two were visiting, defendant walked into the store wearing tan pants, a tan shirt, a long white undershirt, a hat, and a do-rag. Defendant walked to the back of the store, grabbed an iced-tea bottle, and returned to the front of the store where he placed it on the counter, handing Durham money to pay for it. When Durham opened up the register, defendant pulled out a gun and told Durham to give him the money. Durham's friend, seeing the gun, ran out of the store to call 911. After grabbing $386 out of the cash register, defendant ran out of the store. Defendant left his iced-tea bottle on the counter, and police eventually took it into evidence. Durham's friend and another patron at the gas station watched defendant run around the side of the gas station toward the back, through a field behind the gas station, and across M-89.

Robert Emmans and Jason Betts were driving on M-89 when they noticed people pointing and screaming at a gas station near the road, at which point defendant ran directly in front of their truck. Betts jokingly suggested that defendant had robbed the gas station and that

-1-

they should chase him. Emmans, who was driving, pulled the truck to the side of the road toward where defendant appeared to be running, and the two got out to chase him. Defendant ran behind a Comfort Inn, and Emmans saw defendant toss his tan shirt, which was eventually taken into evidence. Defendant ran along a fence behind the Comfort Inn until he came to an opening and went through it. Betts pursued defendant through the opening in the fence. Emmans abandoned the chase after Officer David Rantz ordered him to stop. Officer Rantz had been roughly 300 yards from the gas station when he heard over his radio that it had been robbed. Based on the information he heard over the radio, Officer Rantz went directly to the Comfort Inn. He notified other units by radio that defendant had run through the fence into an area that was owned by the City of Plainwell's Department of Public Works and was bordered by the Kalamazoo River.

Detective John Varley heard Officer Rantz's information over the radio. In route to position himself and box in defendant, he heard yelling and pulled his car over, where he saw Betts yelling behind a fenced area off the side of the road. Detective Varley identified himself to Betts and questioned him. Betts explained that he had been chasing a man who was carrying a gun; at trial, Betts was uncertain whether the man he chased was defendant. Detective Varley ordered Betts to wait by the detective's car for Betts's safety, informed dispatch that defendant was armed, and coordinated efforts to capture defendant.

Detective Varley headed in the direction defendant had run. On seeing that defendant had fled behind a tree line, where pursuit could be dangerous, Detective Varley opted to call a K-9 unit. Two officers arrived with a dog and proceeded to track defendant. The dog first led the officers to a long white shirt, which was taken into evidence. The dog then led the officers to an area with seven-foot tall grass, some of which had been knocked down as though someone had run through the area. Detective Varley and the officer not handling the dog drew their weapons and entered the tall grass, where the detective found defendant lying on the ground wearing khaki pants with a do-rag underneath him. Detective Varley told defendant to put his hands in the air. When defendant complied, the detective saw that he was holding a cell phone. Detective Varley took defendant's phone, holstered his own weapon, and began handcuffing defendant. While handcuffing him, the detective asked defendant where the weapon was. Defendant told the detective that he had tossed it by the river and that it was "just a starter pistol." Detective Varley then searched defendant and found $386, an ID, and credit cards in his right pocket and in the left pocket found $108, a check, and a key ring with keys and a lanyard.

Detective Varley and Officer Rantz drove defendant to the police station, where defendant was placed in an interview room. Detective Varley read defendant his *Miranda*[1] rights, defendant waived those rights, and the detective proceeded to interview defendant. During the interview, defendant told the detective that he was a passenger in a vehicle that drove to the gas station. When asked what happened at the gas station, defendant replied that "he got talked into some dumb shit or took some dumb advice." The detective asked defendant who

---

[1] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

drove him to the gas station, but defendant refused to tell the detective who else was involved and authorities were unable to locate other possible suspects.

Back at the scene, a K-9 unit located a gun in the area behind the Comfort Inn. Durham identified the gun as the one used during the robbery. An expert in fingerprint examination and comparison testified at trial that there were no usable prints recovered from the weapon. However, the expert also examined the iced-tea bottle left at the gas station following the robbery and was able to pull one usable print from the bottle; it matched defendant's left middle-finger. Also at defendant's trial, a trooper from the Michigan State Police's computer crime unit testified that he extracted certain text messages from defendant's phone that were sent from the phone between 2:39 p.m. and 3:58 p.m. on the day of the robbery. Some of the text messages were to defendant's friends in which defendant said that he was "stranded" and needed to be picked up, and others were to his fiancée and stated such things as "I'm sorry, pray for me, have someone take the dogs," "I fuck up, I'm hiding right now," "I was thinking about [all of us]. Pray for me. I needed the money to get mo shit," and "I got played liked a sucker and I thought I was gonna die and all I could do was think of you and the kids."

Before trial, defendant moved to suppress his statements to Detective Varley in response to the detective's question about the location of a weapon. The trial court held a *Walker*[2] hearing, and after taking testimony from Detective Varley, the trial court ruled that the statements were admissible under the public safety exception to *Miranda*.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

On appeal, defendant contends that he is entitled to a new trial because he received ineffective assistance of counsel at trial. Alternatively, he claims that he is entitled to a remand and an evidentiary hearing to explore further his claim of ineffective assistance of counsel. Defendant argues that defense counsel was ineffective at trial for (1) not moving to dismiss for a violation of the 180-day rule, (2) not arguing that defendant's right to a speedy trial was violated, (3) failing to adequately cross-examine Emmans regarding defendant's identity, and (4) breaking a deal with the prosecution regarding discussion of defendant's prior convictions. We disagree.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews for clear error the trial court's findings of fact, and reviews de novo questions of constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Although defendant preserved this issue by moving the trial court for an evidentiary hearing, "because no *Ginther*[3] hearing was held, our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714, 721 (2009).

---

[2] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

To prevail on a claim of ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. When claiming ineffective assistance of counsel, the "defendant bears a heavy burden in establishing that counsel's performance was deficient and that [the defendant] was prejudiced by the deficiency." *People v Lopez*, 305 Mich App 686, 693-694; 854 NW2d 205 (2014) (quotation marks and citation omitted). When addressing an ineffective assistance claim, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," taking into account that under the circumstances, "the challenged action 'might be considered sound trial strategy.' " *LeBlanc*, 465 Mich at 578, quoting *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052, 2065 ; 80 L Ed 2d 674 (1984) (quotation marks and citation omitted).

1. 180-DAY RULE

Defendant first argues that trial counsel was ineffective for failing to move to dismiss for a violation of the 180-day rule.

The 180-day rule is set forth in MCL 780.131(1) as follows:

> Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint. The request shall be accompanied by a statement setting forth the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time or disciplinary credits earned, the time of parole eligibility of the prisoner, and any decisions of the parole board relating to the prisoner. The written notice and statement shall be delivered by certified mail.

The 180-day rule "applies only to those defendants who, at the time of trial, are currently serving in one of our state [correctional facilities], and not to individuals awaiting trial in a county jail." *People v McLaughlin*, 258 Mich App 635, 643; 672 NW2d 860 (2003). Although a parolee remains "in the legal custody and under the control of the" MDOC, MCL 791.238(1), this Court has held that the 180-day rule does not apply to a parolee awaiting trial in jail unless his parole

has been revoked,[4] see *People v Sanders*, 130 Mich App 246, 251; 343 NW2d 513 (1983); see also *People v Von Everett*, 156 Mich App 615, 619; 402 NW2d 773 (1986).

Here, defendant was a parolee awaiting trial in jail. Therefore, the 180-day rule did not apply. *Sanders*, 130 Mich App at 251. Even if the 180-day rule did apply, it does not require the prosecution to bring a defendant to trial within 180 days, but rather it "is sufficient that the prosecutor proceed promptly and move [] the case to the point of readiness for trial within the 180-day period." *People v Lown*, 488 Mich 242, 246; 794 NW2d 9 (2011) (quotation marks and citation omitted; alteration in original). Based on our review of the record, the prosecution undertook action to bring defendant to trial within 180 days and those preliminary actions were not followed by an inexcusable delay or evidence of the prosecution's intent to delay defendant's trial. Accordingly, the 180-day rule was not violated, and defense counsel was not ineffective for failing to raise a meritless objection. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) (holding that defense counsel was "not ineffective for failing to raise meritless or futile objections").

## 2. SPEEDY TRIAL

Next, defendant contends that defense counsel was ineffective at trial for failing to argue that defendant's right to a speedy trial was violated.

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). In *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972), the United States Supreme Court established a balancing test to determine whether a defendant's right to a speedy trial was violated. The Michigan Supreme Court adopted the *Barker* test in *People v Grimmett*, 388 Mich 590, 602-606; 202 NW2d 278 (1972), overruled on other grounds in *People v White*, 390 Mich 245; 212 NW2d 222 (1973), overruled on other grounds in *People v Nutt*, 469 Mich 565; 677 NW2d 1 (2004). This balancing test considers the following four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Williams*, 475 Mich at 261-262. "Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Id*. at 262. A "presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *People v Wickham*, 200 Mich App 106, 109-110; 503 NW2d 701 (1993).

With respect to the first factor under the *Baker* test, the prosecution concedes that nearly 18 months passed from the date of defendant's arrest until the date of trial. Defendant was arrested on October 16, 2013 and his trial began on April 14, 2015, so the relevant time span is actually two days short of 18 months. Both parties treat the almost 18-month delay as presumptively prejudicial, and so will we by addressing the remaining three factors to determine

---

[4] According to defendant's presentence investigation report, defendant's parole was not revoked prior to his trial.

whether defendant was deprived of his right to a speedy trial. See *Wickham*, 200 Mich App at 109-110.

The second factor under the *Baker* test is the reason for this delay. *Williams*, 475 Mich at 261. This Court has recognized that "[a]lthough delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158 (1997) (quotation marks and citation omitted). Upon review of the record, we conclude that defendant was responsible for approximately six months of the delay in bringing this case to trial, including numerous requests for adjournments and, as defense counsel recognized at a hearing before trial, a rather significant delay to allow defendant to conduct a competency and criminal responsibility examination. The remaining 12-month delay was in large part due to delays inherent in the court system. Although these delays are technically attributable to the prosecution, defendant filed eight motions in this case, which substantially contributed to this delay. Hence, the majority of this 12-month delay has a "neutral tint." *Id*. Review of the record reveals no indication that the prosecution failed to diligently pursue the case against defendant and prepare for trial.

In the third factor under the *Baker* test, this Court considers whether the defendant asserted his right to a speedy trial. *Williams*, 475 Mich at 261-262. Here, defendant did not assert his right to a speedy trial until his motion for a new trial or evidentiary hearing. Thus, this factor weighs against defendant.

The final factor under the *Baker* test is the prejudice to the defendant. *Id*. at 262. "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Id*. at 264 (quotation marks and citation omitted). Here, defendant suffered a personal deprivation because he was incarcerated for nearly 18 months before trial. However, this is not determinative, and the Michigan Supreme Court has repeatedly held that longer periods of incarceration do not amount to prejudice to a defendant so long as the defendant's defense is not prejudiced.[5] See *Grimmett*, 388 Mich at 606-607 (holding that a 19-month incarceration was not prejudicial because the defendant's ability to defend himself was not impaired); see also *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) (holding that a 27-month incarceration was not prejudicial because it did not "jeopardize" the defendant's defense).

"Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264. Here, the trial court found that the 18-month delay did not erode defendant's ability to

---

[5] Defendant appears to argue that he was prejudiced by this 18-month incarceration because he did not receive credit for the days served. However, this Court has recognized that the period of time that a defendant serves on a parole detainer is not "dead time" that the defendant receives no credit for because the time is ultimately credited, pursuant to MCL 791.238(2), against the sentence for the paroled offense. *People v Stewart*, 203 Mich App 432, 434; 513 NW2d 147 (1994).

defend himself. Defendant provides no argument to the contrary, and, after a careful review of the record, we find no basis to conclude that the 18-month delay prejudiced defendant's ability to defend himself. Accordingly, after weighing the *Barker* factors, we find that defendant was not denied his right to a speedy trial, and defense counsel at trial was not ineffective for failing to assert a meritless claim. See *Putman*, 309 Mich App at 245.

### 3. CROSS-EXAMINATION OF WITNESSES

Next, defendant argues that trial counsel was ineffective for failing to make reasonable investigations[6] and adequately cross-examine witnesses.

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). However, "[f]ailure to make a reasonable investigation can constitute ineffective assistance of counsel." *People v McGhee*, 268 Mich App 600, 626; 709 NW2d 595 (2005). Likewise, defense "[c]ounsel may provide ineffective assistance if counsel fails to develop the defendant's defenses by adequately impeaching the witnesses against defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

Defendant first argues that defense counsel was ineffective at trial for failing to impeach Emmans when he testified twice that defendant had hair on the day of the robbery even though defendant was clearly bald. From our review of the record, we conclude otherwise. The manner of defense counsel's cross-examination of Emmans clearly indicates that defense counsel was attempting to impeach Emmans using his prior testimony that defendant had hair on the day of the robbery. Moreover, during defense counsel's closing, he argued that Emmans's identification of defendant was suspect based on Emmans's statement that defendant had hair "down to here," showing that defense counsel actually made the argument at trial that defendant now asserts he failed to make. Thus, the record does not support defendant's assertion that defense counsel failed to impeach Emmans. Decisions regarding the questioning of witnesses are matters of trial strategy, and we will not substitute our judgment for the judgment of defense counsel in that regard. *Davis*, 250 Mich App at 368.

Even if defense counsel's cross-examination of Emmans fell below an objective standard of reasonableness, defendant fails to show how the deficient performance prejudiced him. Any deficiencies in defense counsel's cross-examination of Emmans were remedied by admission of defendant's booking photo, which would have shown that defendant was bald and, consequently,

---

[6] To the extent that defendant asserts a failure-to-investigate claim separate from his claim that counsel rendered ineffective assistance in his cross-examination of witnesses, "[d]efendant has abandoned this issue by failing to provide any analysis in the text of his brief on appeal." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *Id*. at 195 (quotation marks and citation omitted).

that Emmans's statement was not true. Therefore, assuming for the sake of argument that defense counsel's cross-examination of Emmans fell below an objective standard of reasonableness, since Emmans was impeached by other means, defendant cannot show that counsel's performance prejudiced him. Accordingly, defendant's claim that defense counsel rendered constitutionally ineffective assistance when cross-examining Emmans must fail. See *Trakhtenberg*, 493 Mich at 51.

Next, defendant argues that the defense counsel was ineffective for questioning defendant about his past convictions despite a deal with the prosecution that defendant would not be questioned regarding those convictions. However, upon review of the record cited by defendant in his brief and other transcripts and documents included with the lower court file, we could find no agreement between the prosecution and defense counsel that defendant's past record would not be admitted at trial. Defendant "has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel[.]" *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Without further guidance as to the agreement that defendant is referring to, defendant has failed to establish the factual predicate for his claim.[7] See *id*.

We conclude that defendant has failed to meet his heavy burden of showing that trial counsel rendered constitutionally ineffective assistance. See *Lopez*, 305 Mich App at 693-694. Trial counsel's failure to file futile motions for dismissal based on alleged violations of the 180-day rule or defendant's right to a speedy trial did not constitute deficient performance. *Putman*, 309 Mich App at 245. The 180-day rule was inapplicable to defendant and, as our application of the *Barker* test shows, his right to a speedy trial was not violated. Further, the record shows that trial counsel did undertake to impeach Emmans, but it does not show that, under the circumstances, trial counsel performed deficiently by asking defendant a simple yes-or-no question regarding whether he had prior felonies.

## B. ADMISSION OF PRE-*MIRANDA* STATEMENTS

Defendant next contends that the trial court erred by admitting defendant's pre-*Miranda* statements in response to Detective Varley's question as to the location of a weapon. We disagree.

This court reviews de novo the trial court's ultimate ruling on a motion to suppress. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). A trial court's factual findings, if any, are reviewed for clear error, while underlying constitutional issues are reviewed de novo. *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). "Clear error

---

[7] At best, we identified an agreement in which defendant stated that he would stipulate that he had a prior felony conviction "as a strategic decision" regarding the felon-in-possession charge so that no specifics regarding that felony would be entered into evidence. It appears that, based on this agreement, defense counsel asked during trial, "[W]ithout explaining anything further than just a simple yes or no answer, is it true that you have a prior felony conviction?" in order to place defendant's prior felony conviction on the record in the least prejudicial way possible. This decision appears to be sound trial strategy. See *Davis*, 250 Mich App at 368.

exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002).

"In *Miranda*, the Supreme Court of the United States determined that the coercive nature of custodial interrogations implicated a defendant's Fifth Amendment right to be free from compelled self-incrimination." *People v Vaughn*, 291 Mich App 183, 188; 804 NW2d 764 (2010), aff'd in part, vacated in part on other grounds, 491 Mich 642 (2012), citing *Miranda v Arizona*, 384 US 436, 458; 86 S Ct 1602; 16 L Ed 2d 694 (1966). To protect the right against self-incrimination,

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. [*Miranda*, 384 US at 444; 86 S Ct at 1612.]

"In order to determine whether someone was in custody or otherwise deprived of his freedom of action a court is to consider the totality of the circumstances, with the key question being whether the defendant reasonably believed that he was not free to leave." *People v Barritt*, ___ Mich App ___, ___; ___ NW2d ___ (2017), lv pending (Docket No. 333206); slip op at 5 (quotation marks and citation omitted).

Courts have recognized that a "public safety exception" to the rule from *Miranda* exists when there is an immediate concern for the safety of the public and police questioning is "objectively necessary" to ensure public safety. See *People v Attebury*, 463 Mich 662, 671; 624 NW2d 912 (2001); see also *New York v Quarles*, 467 US 649, 655-656; 104 S Ct 2626, 2631-2632; 81 L Ed 2d 550, 556-557 (1984) (recognizing the "public safety" exception to the *Miranda* requirement). The "use of the phrase 'public safety' clearly encompasse[s] the safety of the officers as well as the general public." *Attebury*, 463 Mich at 671.

Here, the testimony given at defendant's *Walker* hearing establishes that he was in custody at the time he was asked about the location of the firearm and made the statement to Detective Varley. Detective Varley, along with another officer, drew his weapon on defendant, and another officer waited outside of the grass with a trained dog. Defendant complied with the detective's command to put his hands up. While Detective Varley handcuffed defendant, the other officer remained with his weapon drawn on defendant. When Detective Varley asked defendant the location of the gun, one of defendant's hands was secured in a handcuff. Accordingly, defendant was in custody because a reasonable person in defendant's position would not have felt free to leave. *Barritt*, ___ Mich App at ___; slip op at 5.

Although defendant was in custody and Detective Varley asked defendant the location of the gun without Mirandizing him, defendant's statement falls under the public safety exception to *Miranda*. Defendant contends that the officers were in control of the situation, making the risk of immediate danger remote and, accordingly, the public safety exception inapplicable.

However, defendant was not entirely secured and Detective Varley knew that defendant was a suspect in the armed robbery that occurred within hours of the arrest. Moreover, Betts informed the detective that the man he chased had a gun, and defendant was found hiding in the area that the man Betts chased had fled. Even though Detective Varley had one of defendant's hands cuffed, the detective was unable to see whether the gun was in the surrounding area due to the dense foliage. Thus, Detective Varley's question regarding the location of the gun was reasonably necessary to protect himself and the other officers from the inherent and immediate danger posed by the unseen but known of gun.[8] See *Attebury*, 463 Mich at 670-672. The question was not investigatory, as Detective Varley reasonably feared for his safety and the safety of the other officers. Moreover, the detective limited his question to the location of the gun and neutralizing the danger caused by it. See *id.* at 674 (emphasizing that the defendant's rights were not violated because the officers' questioning was solely about neutralizing the danger and did not involve broader questions related to the investigation of the crime). Accordingly, the trial court did not err by admitting defendant's pre-*Miranda* statement to the police because it fell squarely under the public safety exception.

Affirmed.

/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Jane M. Beckering

---

[8] We also note that defendant fled across the parking lot of a Comfort Inn, and that he abandoned clothing as he went. Objectively speaking, it was possible that he abandoned the gun in or around the parking lot. As long as its whereabouts were unknown, the gun posed more than one danger to the public safety: an accomplice might make use of it or a hotel guest, a guest's child, or a hotel employee might come upon it. See *Quarles*, 467 US at 657; 104 S Ct at 2632; 81 L Ed 2d at 558.