# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DANIEL CLAY,

        Defendant-Appellant.

UNPUBLISHED
January 8, 2019

No. 339659
Monroe Circuit Court
LC No. 16-243127-FC

Before: STEPHENS, P.J., and K. F. KELLY and TUKEL, JJ.

PER CURIAM.

Defendant appeals by right his jury convictions for felony murder, MCL 750.316, and concealing the death of an individual, MCL 333.2841(3). He was sentenced to life imprisonment without the possibility of parole for the felony-murder conviction and to 40 to 60 months' imprisonment on the concealment conviction. On appeal, we affirm defendant's convictions and sentence.

## I. BACKGROUND

This case arose from the sexual assault and murder of Chelsea Bruck. Chelsea, aged 22, was last seen alive on October 25, 2014 at a Halloween party in Newport, Michigan. She was dressed as a poison ivy character in a costume she had made herself from a green leotard to which she attached leaves and flowers. She also wore an "auburn red and purplish" wig, black leggings and flats. She carried a wine bottle to represent the bottle of poison her character would have held. Chelsea drove to the party with friend and coworker Laura Taylor at approximately 10:00 p.m. Chelsea took an overnight bag, change purse and cellphone with her but left them in Taylor's vehicle. Taylor gave Chelsea's bag, purse and phone to their mutual friend Becky Brinson before leaving the party at approximately 1:00 a.m. Unable to find Chelsea before she left the party, Brinson took Chelsea's property with her.

Between 1:00 a.m. and 3:00 a.m., Chelsea approached multiple people at the party to use their cellphones. Chelsea was crying when she approached Gavin Hulet at approximately 1:00 a.m. to use his phone and told him that her friends had left her at the party. Alexandria Fraunhoffer also let Chelsea use her phone sometime between 2:00 a.m. and 3:00 a.m. to try to find a ride home from the party.

Chelsea however, did not make it home that night, or the next night, and on October 27, 2014, Chelsea's parents reported her as a missing person. Despite a concerted effort by law

-1-

enforcement, family, and friends, there was no real development in the case of Chelsea's disappearance until March 22, 2015, when Sheryl Retzlaff found a woman's shoe while cleaning her yard. Retzlaff owned three and a half acres of partly wooded property that was located approximately 2.3 miles from the Halloween party's location. She found the shoe, which Chelsea's mother identified as belonging to Chelsea, near a ditch with lots of trash. Approximately one week later, Eric Kassab found Chelsea's leotard and wig in an abandoned building by the railroad tracks at 26361 Peters Road, Flat Rock, Michigan. The following month, on April 24, 2015, John Marcon found Chelsea's skeletal remains while working on his 13 acres of undeveloped land on Briar Hill Road in Ash Township, Monroe County, Michigan. Later, on September 2, 2015, Marcon found a red shoe in the same vicinity the body had been found. Marcon's property was approximately seven miles from the Retzlaff's property, where the other shoe had been found.

Law enforcement did not have a suspect in Chelsea's murder until a brown stain on Chelsea's leotard was processed for DNA and returned a match to the defendant on July 18, 2016. Defendant was questioned on July 22, 2016, in relation to Chelsea's murder. He admitted to being at the same Halloween party as Chelsea, but initially denied having either seen or talked to her. Defendant's story changed multiple times in discussions with officers. He later admitted seeing her but denied talking to her. His next version of the facts was that he saw her and only talked briefly to her. Eventually, he acknowledged a consensual sexual encounter. First, he stated that he had sex with her once in the backseat of his vehicle with the two going their separate ways afterwards. Finally, he gave a detailed and graphic version of events. In that version, he said that after the party he saw Chelsea walking along the road, intoxicated and offered her a ride home. He admitted they stopped at the side of the road to have sex a second time. Defendant told law enforcement that during this second sexual encounter, Chelsea began biting him and smacking him and yelled for defendant to choke her. Defendant complied, but after 20 to 30 seconds of choking, Chelsea went limp. Defendant said he stopped having sex and began efforts to revive her. Defendant panicked when Chelsea did not respond and decided to hide her body in a nearby wooded area.

At trial, the medical examiner testified that Chelsea died from blunt force trauma to the head. Doctors identified multiple fractures to Chelsea's orbital bones, jawbone, and teeth. Michigan State Police forensic experts testified that the straps of Chelsea's leotard were twisted and pulled apart, while the crotch area was ripped open. Defendant maintained that he engaged in consensual sexual intercourse involving erotic asphyxia that resulted in Chelsea's accidental death. He explained Chelsea's fractures as having been caused by his dropping her body multiple times on his way to conceal it, due to intoxication. The jury rejected defendant's theory and found him guilty of felony murder and concealing the death of an individual.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first challenges the sufficiency of the evidence to sustain his conviction for felony murder.

## A. STANDARD OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *Id*. at 196. "Circumstantial evidence and reasonable inferences therefrom may be sufficient to prove all the elements of an offense beyond a reasonable doubt." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007). "[I]n reviewing a sufficiency-of-the-evidence claim, we must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the jury verdict." *Id*.

## B. ANALYSIS

Defendant challenges his conviction for felony murder on the ground that there was insufficient evidence that he committed the underlying felony of third-degree CSC. "The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009) The predicate felony relied on by the prosecution was third-degree CSC. The elements of third-degree CSC are: 1) sexual penetration of another person, 2) accomplished by force or coercion or 3) where the actor knows the victim is physically helpless. *People v Hutner*, 209 Mich App 280, 283; 530 NW2d 174 (1995). "[M]alice is an essential element of murder that cannot be inferred solely from the intent to commit the underlying felony." *People v Smith*, 108 Mich App 338, 342; 310 NW2d 235 (1981).

Defendant first argues there was insufficient evidence for the jury to find him guilty beyond a reasonable doubt of third-degree CSC because there was no evidence that penetration was accomplished by force or coercion. He argues that his testimony regarding consent and the weakness of the prosecution's proofs weigh in favor of his argument.

Consent is a defense to third-degree CSC, negating the elements of force and coercion. *People v Waltonen*, 272 Mich App 678, 689; 728 NW2d 881 (2006). Defendant admitted that he and Chelsea had sex twice the night of the Halloween party but testified that at both times it was consensual. The defendant offered testimony regarding consent. On the contrary, the prosecution offered evidence that impled force, that Chelsea's Halloween costume had been torn apart and that her face was severely assaulted. Testimony from Michigan State Police forensic scientist Jennifer Rizk analyzed the fabrics of Chelsea's leotard. She testified that the straps of the leotard had been torn at the hems, in a twisting and pulling event. She also testified that there was a bloodstain on the inside chest area of the leotard. She additionally testified that the crotch area of the leotard had been torn and cut open with a blunt force instrument. The expert testimony at trial indicated that Chelsea suffered traumatic isolated injuries to her jawbone, teeth and orbital bones.

Defendant argues that just as plausible was that the costume became damaged during the thralls of mutual intoxication and passion. Even assuming arguendo defendant's explanation, there was the additional evidence of force in that Chelsea was also assaulted. Defendant

explained Chelsea's injuries as resulting from his dropping her multiple times on the way to the site where he concealed her body. He purported that dropping Chelsea's body on the chin could have caused the mandible fracture, dropping her on the left of her face and then the right could have caused the orbital fractures, and that smashing her head in the car door or rolling a large tree limb over her body could have caused the facial fractures. The medical experts were willing to grant defendant's explanations of the fractures as being in the realm of probabilities. Their testimony however indicated that those probabilities were remote. Forensic anthropologist Dr. Megan Moore called defendant's theory that Cheslea's factures could have resulted from defendant dropping her body multiple times, "somewhat of a stretch." She testified that if the body were dropped from defendant's height, which assumed his theory that he dropped Chelsea while carrying her over his shoulder, the jawbone could have been fractured, but she would have expected injury to the bridge of the nose as well, because it was a protruding structure. She further disagreed with defendant's theories that dropping the body or a large tree limb on the body caused the orbital fractures. She testified "[t]hose orbits are slightly more selective of a force because it would have be something just ye big to only break this area and not cross" over the nose. Defense expert Dr. Daniel Spitz agreed that defendant's dropping of the body and the log rolling over it were possible explanations for Chelsea's fractures however, he agreed with Dr. Moore that the manner of death was homicide. Deputy Chief Medical Examiner for Wayne County Dr. Leigh Hlavaty disagreed that the jaw could be fractured from a fall. The doctor testified that the area where the fracture occurred was "a rather protected part of the jaw, so it would be very difficult in a fall to strike that area and cause both of those fractures." Dr. Hlavaty concluded that the cause of Chelsea's death was blunt force trauma to the face because it was her opinion that the fractures themselves would have been severe enough to cause death. While it was ultimately "the jury's task to weigh the evidence and decide which testimony to believe," *People v Unger*, 278 Mich App. 210, 222; 749 NW2d 272 (2008) (citation omitted), there was sufficient evidence of record to support that Chelsea's injuries were not accidental.

Defendant additionally argues that his intoxication minimized his faculties and therefore somehow negated his intent to kill. However, "it is not a defense to any crime that defendant was, at that time, under the influence of or impaired by a voluntarily and knowingly consumed alcoholic liquor, drug, including a controlled substance, other substance or compound, or combination of alcoholic liquor, drug, or other substance or compound." MCL 768.37(1). The element of malice can be inferred from the facts and circumstances of the killing. *People v Flowers*, 191 Mich App 169, 176–177; 477 NW2d 473 (1991). Defendant admitted to smacking and choking Chelsea at her request during sex, but would not admit to causing her facial fractures. His testimony however, that he was intoxicated, experienced periods of blacking out and could not recall the events entirely, allowed for the jury to infer that defendant intentionally struck Chelsea in the face causing her death.

Defendant alternatively argues that there was insufficient evidence that Chelsea was physically helpless. A person is physically helpless when she "is unconscious, asleep, or for any other reason is physically unable to communicate unwillingness to an act." MCL 750.520a(m). "[T]he essence of physical helplessness is that the victim is unable to communicate unwillingness to an act." *People v Perry*, 172 Mich App 609, 622; 432 NW2d 377 (1988). Defendant testified that before he realized Chelsea's body was limp, he had applied approximately 30 seconds, at the most 45 seconds continuous pressure to her neck. Dr. Hlavaty testified that in the case of manual strangulation, if a person were restrained or intoxicated, she

would lose consciousness within 20 to 30 seconds. The testimony supports a window of time where defendant could have engaged in sexual intercourse with an unconscious victim.

Defendant additionally argues that he could not be guilty of CSC if Chelsea was deceased before the second sexual encounter began and claims there was no evidence that Chelsea died before, during or after sex. It is true that "the crime of criminal sexual conduct requires a live victim at the time of penetration." *Hutner*, 209 Mich App at 283. Defendant's argument however, is meritless. There was no evidence presented that Chelsea was dead before their second sexual encounter. In fact, defendant's own testimony established that Chelsea was speaking to defendant and making noises indicating sexual arousal up until the point defendant noticed she was limp.

Viewing the evidence in a light most favorable to the prosecution, the essential elements of third-degree CSC were proved beyond reasonable doubt where defendant admitted having sexual intercourse with Chelsea, and Chelsea's costume and facial fractures were evidence from which the jury could infer that penetration was accomplished by force

### III. MOTION TO SUPPRESS DNA EVIDENCE

Defendant next argues that wrongful retention of his DNA warrants him a new trial.

### A. STANDARD OF REVIEW

"This Court reviews de novo a trial court's ruling on a motion to suppress." *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011). "We review a trial court's factual findings in a ruling on a motion to suppress for clear error." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001). "A factual finding is clearly erroneous if it leaves the Court with a definite and firm conviction that the trial court made a mistake." *Steele*, 292 Mich App at 313.

"The constitutionality of a statute is a question ordinarily reviewed de novo." *People v Abraham*, 256 Mich App 265, 280; 662 NW2d 836 (2003).

### B. ANALYSIS

Defendant filed a pretrial motion to suppress DNA evidence that was retained in violation of MCL 28.176. That motion was heard on April 12, 2017, at the end of defendant's *Walker* hearing. Defendant argued that he was charged with a felony in 2016 that was dismissed at the preliminary examination. He asserted that while his DNA was lawfully collected upon his arrest for that felony under MCL 28.176, it should have been destroyed when the charge was dismissed. He contended that the only way his DNA was identified as a match to that found on Chelsea's leotard was because his DNA was unlawfully retained in the CODIS system after his case's dismissal. He further contended that the remedy for the violation of the statute was to suppress the DNA evidence obtained as fruit of the poisonous tree. He also argued that provisions of the statute insulating error in the retention and allowing retention for misdemeanor offenses were unconstitutional. The prosecutor countered that defendant's DNA was already in the system from a 2015 felony conviction for Attempted Assaulting, Resisting or Obstructing a Police Officer. The prosecution also asserted that MCL 28.176 did not require immediate destruction of the DNA sample. It asserted that per the statute, it had up to 60 days after the

dismissal to expunge defendant's DNA and that time had not lapsed from the dismissal to finding defendant's DNA in the CODIS system in connection with this case. It also argued that defendant's DNA would have inevitably been discovered when a sample was collected again in August 2016 in connection with defendant's charges for two other felony offenses. Lastly, the prosecution contended that if there were an error in retaining the DNA, suppression of the evidence was a drastic remedy for violation of the statute and that MCL 28.176(15) provided an exception for "good faith error." The court denied defendant's motion to suppress for the reasons stated by the prosecution. The court's decision was not clearly erroneous.

On appeal, defendant relies on section (4) of the MCL 28.176 that provides:

The county sheriff or the investigating law enforcement agency as ordered by the court shall provide for collecting the samples required to be provided under subsection (1) …. However, the individual's DNA sample must not be forwarded to the department if the individual is not charged with committing or attempting to commit a felony offense or an offense that would be a felony if committed by an adult. If the individual's DNA sample is forwarded to the department despite the individual not having been charged as described in this subsection, the law enforcement agency shall notify the department to destroy that sample. The collecting and forwarding of samples must be done in the manner required under this act. A sample must be collected by the county sheriff or the investigating law enforcement agency after arrest but before sentencing or disposition as ordered by the court and promptly transmitted to the department of state police after the individual is charged with committing or attempting to commit a felony offense or an offense that would be a felony if committed by an adult. This subsection does not preclude a law enforcement agency or state agency from obtaining a sample at or after sentencing or disposition. At the time a DNA sample is taken from an individual under this section, the individual shall be notified in writing of all of the following:

 (a) That, except as otherwise provided by law, the individual's DNA sample or DNA identification profile, or both, shall be destroyed or expunged, as appropriate, if the charge for which the sample was obtained has been dismissed or resulted in acquittal, or no charge was filed within the limitations period.

 (b) That the individual's DNA sample or DNA identification profile, or both, will not be destroyed or expunged, as appropriate, if the department determines that the individual from whom the sample is taken is otherwise obligated to submit a sample or if it is evidence relating to another individual that would otherwise be retained under this section.

 (c) That the burden is on the arresting law enforcement agency and the prosecution to request the destruction or expunction of a DNA sample or DNA identification profile as required under this section, not on the individual. [MCL 28.176(4)].

According to MCL 28.176(4), law enforcement has the authority to collect DNA samples as provided under MCL 28.176(1). MCL 28.176(1) provides that "the department shall permanently retain a DNA identification profile of an individual . . . if [t]he individual is arrested for committing or attempting to commit a felony offense or an offense that would be a felony offense if committed by an adult." MCL 28.176(1)(a). In the event the individual is not charged, per MCL 28.176(4)(a), the individual's DNA should be destroyed and not forwarded to the department of state police[1]. In the event the DNA was forwarded, law enforcement must notify the department to destroy the DNA sample. The destruction of a DNA sample after dismissal of charges is not immediate however. According to MCL 28.243(8)(b), when charges are dismissed, the prosecutor has "60 days from the date an order of dismissal was entered" to object to the dismissal, which also stays the expungement of destruction of the DNA sample for up to 60 days. MCL 28.176(4)(c) places the burden on law enforcement and the prosecutor to request the destruction. Further, MCL 28.176(4)(b) provides that even in the case where charges were dismissed, retention of an individual's DNA sample is appropriate where "it is evidence relating to another individual that would otherwise be retained under this section."

Applying these statutory provisions to the circumstances here demonstrates that defendant's DNA was not unlawfully retained. Defendant was charged with Larceny from a Person on or about May 11, 2016 and his DNA was lawfully collected per MCL 28.176(1)(a), at the time of his arrest. Defendant's DNA was forwarded to the department after his arrest, but before conviction. On May 24, 2016, the Larceny from a Person charge was dismissed. On July 18, 2016, CODIS operators found an association or "hit" in the database between the DNA profile taken from Chelsea's leotard and defendant's DNA entered from the larceny charge. The total number of days between May 24, 2016 and July 18, 2016 was 55. This period of retention was not in violation of the statute because 55 days was within the 60 days statutorily allotted for the prosecutor to object to the dismissal and retain the DNA. Further, the association of defendant's DNA in an investigation for murder also made it retainable under MCL 28.176(4)(b).

We also agree with the prosecution's argument and trial court's finding concerning inevitable discovery. Again, a DNA match was found in CODIS on July 18, 2016 and defendant was arrested for Chelsea's murder on July 22, 2016. On or about August 8, 2016, defendant, who was already in custody, was charged with first-degree CSC and home invasion concerning the sexual assault of another woman. Therefore, defendant's DNA would have been inevitably discovered when collected for the felony arrest in August.

Defendant next argues that his DNA should not have been collected in the first instance because he was not charged with a serious offense. We disagree. Defendant was charged with larceny from a person in violation of MCL 750.357. Larceny from the Person is by legislative definition, a class D "high severity felony" punishable by a maximum term of imprisonment of 10 years or more. Michigan Sentencing Guidelines Manual (2016), p 18; MCR 777.16r. MCL 27.176(1)(a) provides that a sample of defendant's DNA is to be taken when "[t]he individual is

---

[1] " 'Department' means the department of state police." MCL 28.172(a).

arrested for committing or attempting to commit a felony offense." Thus, we see no error on this basis.

Defendant contends the statute is unconstitutional because it is overbroad in that it allows DNA testing for several misdemeanor offenses and every case resulting in a felony charge regardless of the seriousness of the offense. Defendant asserts that the Michigan statute fails to comply with the narrow parameters set forth in *Maryland v King*, 569 US 435; 133 S Ct 1958; 186 L Ed 2d 1 (2013). "Statutes are presumed to be constitutional, and courts have a duty to construe them as such." *People v Thomas*, 201 Mich App 111, 116; 505 NW2d 873 (1993). "Absent a showing that unconstitutionality is clearly apparent, the statute will be upheld." *Id*. "The party challenging the constitutionality of the statute has the burden of proving its unconstitutionality." *Abraham*, 256 Mich App at 280. "The challenger to the face of a statute must establish that no circumstances exist under which it would be valid." *Id*. A claim that a statute's coverage is overbroad is a challenge for vagueness. *Matter of Gentry*, 142 Mich App 701, 707; 369 NW2d 889 (1985). "[C]onstitutional challenges on the basis of vagueness, other than those based on First Amendment rights, must be examined in the light of the case's particular facts." *People v Green*, 123 Mich App 563, 565; 332 NW2d 610 (1983). Defendant lacks standing to argue the constitutionality of the statute on this basis, because his conduct involved a serious felony, and not a misdemeanor offense. "[F]or defendant to have standing to challenge the statute on overbreadth the statute must be 'overbroad in relation to defendant's conduct. One may not constitutionally challenge a statute on grounds of overbreadth against him when the statute clearly applies.' " *Id*. quoting *People v Burton*, 87 Mich App 598, 601; 274 NW2d 849 (1978).

Defendant further argues the statute is unconstitutional because it insulates police and prosecutorial misconduct. Defendant is specifically referring to MCL 28.176(15)[2] that provides:

An identification, warrant, detention, probable cause to arrest, arrest, or conviction based upon a DNA match or DNA information is not invalidated if it is later determined that 1 or more of the following errors occurred in good faith:

(a) A DNA sample was erroneously obtained.

(b) A DNA identification profile was erroneously retained.

(c) A DNA sample was not disposed of or there was a delay in disposing of the sample.

(d) A DNA identification profile was not disposed of or there was a delay in disposing of the profile.

The taking of defendant's DNA sample constituted a lawful search and seizure incident to his arrest under MCL 28.176. MCL 28.176(15)(a) indicates a "good-faith" exception

[2] 2014 PA 457 has since been amended, see 2018 PA 310, so that the language of (15) is now in (14) however, the substance of the provision is the same.

concerning the retention of defendant's DNA. Michigan has adopted the good-faith exception to the exclusionary rule concerning searches and seizures and in any event, defendant's claim of improper retention lacks merit.

## IV. MOTION TO SUPPRESS CUSTODIAL STATEMENT

Defendant next claims that statements he gave to law enforcement were obtained through violation of his Fifth Amendment right to counsel, warranting him a new trial.

### A. STANDARD OF REVIEW

"This Court reviews de novo a trial court's ruling on a motion to suppress." *Steele*, 292 Mich App at 313. "We review a trial court's factual findings in a ruling on a motion to suppress for clear error." *Attebury*, 463 Mich at 668. "A factual finding is clearly erroneous if it leaves the Court with a definite and firm conviction that the trial court made a mistake." *Steele*, 292 Mich App at 313.

### B. ANALYSIS

In *Miranda v Arizona*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that "[p]rior to any questioning, the [accused] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). These warnings are generally referred to as the accused's *Miranda* rights. "A statement obtained from a defendant during a custodial interrogation is admissible only if the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights." *People v Akins*, 259 Mich App 545, 564; 675 NW2d 863 (2003). "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda*, 384 US at 444-445. "When a defendant invokes his right to counsel, the police must terminate their interrogation immediately and may not resume questioning until such counsel arrives." *People v Tierney*, 266 Mich App 687, 710-711; 703 NW2d 204 (2005). This "second layer of prophylaxis for the *Miranda* right to counsel," *McNeil v Wisconsin,* 501 US 171, 176; 111 S Ct 2204; 115 L Ed 2d 158 (1991), is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v Harvey*, 494 US 344, 350; 110 S Ct 1176; 108 L Ed 2d 293 (1990). Courts are therefore required to "determine whether the accused actually invoked his right to counsel." *Smith v Illinois*, 469 US 91, 95; 105 S Ct 490; 83 L Ed 2d 488 (1984) quoting *Fare v Michael C*, 442 US 707, 719; 99 S Ct 2560; 61 L Ed 2d 197 (1979). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v United States*, 512 US 452, 459; 114 S Ct 2350; 129 L Ed 2d 362 (1994).

At issue here is whether defendant unequivocally invoked his right to counsel during his July 22, 2016 interrogation after a valid waiver of his *Miranda* rights. Defendant moved to suppress his confession given to law enforcement during his interrogation and was granted a

*Walker*[3] hearing. "[T]he sole purpose of the *Walker* hearing is to determine the fact of voluntariness and a reviewing court is concerned only with the correctness of that determination." *People v Robinson*, 386 Mich 551, 557; 194 NW2d 709 (1972). The proper invocation of counsel bears on the voluntariness of the confession. *People v Sexton*, 458 Mich 43, 68; 580 NW2d 404 (1998). The prosecution bears the burden of proving voluntariness by a preponderance of the evidence. *People v Sears*, 124 Mich App 735, 738; 336 NW2d 210 (1983).

Defendant's *Walker* hearing focused on two statements from defendant's July 22 recorded interrogation. In the first statement defendant said,[4] "If my DNA is on her, then I think I need a lawyer, but I have no idea how my DNA was on her." Detective Preadmore testified that he did not believe that defendant's statement was a request for counsel, because when he told defendant all questioning would have to stop, defendant said "Okay. Let's talk for now" and shortly thereafter, "I do not want an attorney." Defense counsel conceded at the *Walker* hearing that this statement "was a little wishy-washy," and "doesn't pass the sniff test." The court found that defendant made it "crystal clear" that he did not want a lawyer at this point of the interrogation. The trial court's finding was not clearly erroneous.

In *Davis*, the Court held that the defendant's statement, "Maybe I should talk to a lawyer," was not sufficient to invoke his right to counsel and end questioning. *Davis*, 512 US at 462. In *Tierney*, this Court held that defendant's statements, "Maybe I should talk to an attorney," or "I might want to talk to an attorney," were not clear demands for counsel. 266 Mich App at 711. Here, defendant's statement, "I think I need a lawyer," is no different. Defendant did not ask for an attorney, but pondered, out loud, whether he might need one given that there was evidence of his DNA found. The record shows that Preadmore attempted to clarify what defendant meant when he said, "I think I need a lawyer," and whether defendant did in fact want an attorney. Defendant's response was "I do not want an attorney." Based on this colloquy the trial court did not err when it found that defendant was "crystal clear" about not wanting an attorney and that his statement, "I think I need a lawyer" was not a demand for counsel.

In the second instance, defendant asked, "May I have a lawyer brought here to speak while you're here today? Can we do it right now so I can ask the lawyer about my rights before I say anything more?" Detective Preadmore testified that he understood defendant's questions as defendant asking him if he could have an attorney come right then, and Detective Preadmore replied, "no." The prosecution argued that defendant's question was capable of being understood in more than one way and that it was not a sufficiently clear articulation of a request for counsel. Defendant argued to the contrary that this was a clear request for counsel where defendant asked for the opportunity to speak to a lawyer about his constitutional rights. He contended that the unavailability of counsel was not a reason to deny defendant's request. Defendant further argued he was pressured into giving a statement right then and there by Preadmore who later said, "There will be no Monday" and offered to be "his mouthpiece on the

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[4] The court watched the entire interrogation in chambers.

street." The court found that defendant's questions were not a clear demand for an attorney, and that defendant rather wanted to tell his side of the story, and denied the motion suppress. This decision was not clearly erroneous.

Defendant testified that he understood that he could tell the detective to quit talking to him at any point, but that he chose not to do so because he was scared and trying to figure out what was going on. Defendant also testified that he believed that the detectives would be more favorable to him if he waived his right to a lawyer, but admitted that he was not promised anything in exchange. He additionally testified that when he asked for an attorney, and was told he could not have one, he thought:

> I was pretty much either gonna talk to them then or not talk to them; that I wasn't going to be able to get one the and I wanted to be able to talk and tell them and find out what they knew and what they wanted to know and put my side of the story out there.

It was not outside the range of principled outcomes for the court to have found that defendant's request for counsel was conditional on whether there was an attorney available at the time of his interrogation. Preadmore informed him that an attorney was not available. Defendant understood that he would not be able to talk to an attorney until possibly Monday and that the detectives would stop the interrogation. Based on this information, defendant elected not to stop the questioning because he wanted to learn the evidence against him and tell his side of the story. Thus, the trial court did not clearly err in finding that defendant did not make an unequivocal and unambiguous request for counsel and denying the motion to suppress.

Defendant also challenged the admissibility of his statements on the ground that he was of "unsound mind" at the interrogation. At the *Walker* hearing defendant testified that when law enforcement knocked on his door to take him into custody, he "drank the last couple shots that was in a bottle I had, popped a couple Neurontins (phonetic) and Vicodins." He testified that while he was not "obliterated," he was "buzzed." Preadmore testified that defendant did not appear to be intoxicated or under the influence of drugs during the interview. The court indicated that it watched the entire interrogation and before ruling on the record, reviewed certain portions of the recording again at defendant's request. It found, "[t]here was no sign" that defendant "was intoxicated, drugged or ill" and pointed out that defendant said in his interview that a glass of water given to him by Sroka, was the "only thing he had drank all day." "Intoxication from alcohol or other substances can affect the validity of a waiver of Fifth Amendment rights, but is not dispositive." *Tierney*, 266 Mich App at 707. In this case, we defer to the trial judge's ability to better assess the defendant's demeanor and credibility. MCR 2.613(C).

## V. PRETRIAL PUBLICITY

Defendant further argues that he is entitled to a new trial based on adverse pretrial publicity.

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

-11-

Defendant challenges the trial court's denial of his motion to change venue and trial counsel's decision not to renew the motion at the time of jury selection. The first issue is preserved, while the second is not. A defendant preserves a change of venue issue by moving for a change of venue in the trial court. *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). An ineffective assistance of counsel claim is preserved by moving for a new trial or *Ginther*[5] hearing in the court below. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). Defendant argues on appeal, as he did below, that a change of venue was warranted because adverse pretrial publicity denied him an impartial jury. New on appeal, is that counsel was ineffective for failing to renew the motion to change venue at the time of jury selection.

This Court reviews for an abuse of discretion whether the trial court erred by denying a defendant's motion for change of venue. *People v Lee*, 212 Mich App 228, 252; 537 NW2d 233 (1995), lv den 453 Mich 884 (1996). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Otherwise, we review an unpreserved change of venue issue for plain error affecting defendant's substantial rights. *Kowalski*, 489 Mich at 505.

Our review of defendant's ineffective assistance of counsel claim is limited to mistakes apparent on the record, because no *Ginther* hearing was held. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

## B. ANALYSIS

"Generally, criminal defendants must be tried in the county where the crime was committed." *Unger*, 278 Mich App at 253-254. "An exception to the rule provides that the court may, in special circumstances where justice demands or statute provides, change venue to another county." *People v Jendrzejewski*, 455 Mich 495, 499-500; 566 NW2d 530 (1997). Sometimes, "it may be appropriate to change the venue of a criminal trial when widespread media coverage and community interest have led to actual prejudice against the defendant." *Unger*, 278 Mich App at 254. "Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice." *Jendrzejewski*, 455 Mich at 500-501. "A defendant who chooses a jury trial has an absolute right to a fair and impartial jury." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). A change of venue might be warranted in cases of "extensive egregious media reporting," "a barrage of inflammatory publicity leading to a 'pattern of deep and bitter prejudice' against the defendant," "highly inflammatory attention to sensational details" or when "a carnival-like atmosphere surrounding the proceedings" develops. *Jendrzejewski*, 455 Mich at 506–508 (citations omitted).

---

[5] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

Defendant filed a pretrial motion to change venue that argued extensive media coverage of this case so saturated the Monroe County area that it would be very difficult for defendant to get a fair trial there. In the event the court denied his motion, defendant requested the opportunity to renew it at the time of jury selection if he was unable to pick an impartial jury. The court denied the motion without prejudice. It found that the media coverage had not been so extensive or inflammatory that jurors exposed to it would not be able to remain impartial, but granted defendant's request to renew his motion. Defendant did not renew his motion however and instead expressed satisfaction with the jury after voir dire. Defendant now argues that he was deprived his right to an impartial jury by the trial court's denial of his motion to change venue where adverse pretrial publicity created a presumption of prejudice. He also faults the court for not questioning jurors individually to expose any bias during jury selection. Defendant waived both these issues when he failed to renew his motion to change venue and expressed satisfaction with the jury. *People v Clark*, 243 Mich App 424, 425-426; 622 NW2d 344 (2000), compels this conclusion. There,

> Defense counsel moved for a change of venue before trial. The trial court denied the motion without prejudice, stating that it was willing to reconsider the motion at any time during the jury selection process. A thorough jury selection process ensued, which included lengthy juror questionnaires, the participation of the attorneys in voir dire, and sequestered questioning of each potential juror. Defense counsel never renewed the motion for a change of venue, but, rather, expressed satisfaction with the jury after the jury selection process was completed. Defense counsel's failure to renew the motion and his expression of satisfaction with the jury waived the change of venue issue. [*Clark*, 243 Mich App at 426.]

As in *Clark*, the issue here is waived.

Defendant next argues counsel was ineffective for failing to renew his motion to change venue. To establish an ineffective assistance claim, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness under professional norms and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different and the result that did occur was fundamentally unfair or unreliable." *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). "The decision whether or not to move for a change of venue constitutes a matter of trial strategy." *People v Anderson*, 112 Mich App 640, 646; 317 NW2d 205 (1981). "The existence of pretrial publicity does not by itself require a change of venue. If jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court, a change of venue is not necessary." *People v Prast*, 114 Mich App 469, 477; 319 NW2d 627 (1982) (internal citation omitted). "In this state, as in the United States Supreme Court, the general rule holds that if a potential juror, under oath, can lay aside preexisting knowledge and opinions about the case, neither will be a ground for reversal of a denial of a motion for a change of venue." *Jendrzejewski*, 455 Mich at 517.

Of the 12 jurors who decided defendant's case, none indicated an influence from pretrial publicity. Defense counsel questioned the jurors on their knowledge of the case from the media, whether they formed any preconceived conclusions based on what they read or heard, whether they could maintain impartiality, and whether they understood defendant was innocent until

proven guilty. Counsel's questions were designed to expose any potential bias. Those impaneled overwhelming relayed that what they heard from the news and social media was not evidence and not always trustworthy, that they were not following the case, and recalled hearing about it more so when it first happened some two years prior. Counsel's decision not to renew defendant's motion to change venue was reasonable trial strategy. The jurors were not required to "be totally ignorant of the facts and issues involved." *Irvin*, 366 US at 722. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id*. at 723. In this case, because the jurors indicated the ability to be fair and impartial, had defendant renewed his motion, it would have been denied. Counsel was not required to raise a futile motion. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant additionally argues that he suffered prejudice by having to waste his peremptory challenges on tainted jurors. We disagree. Voir dire "is the only mechanism, and the only safeguard a defendant has, for ensuring the right to an impartial jury." *Tyburski*, 445 Mich at 618. That said, in *Ross v Oklahoma*, 487 US 81; 108 S Ct 2273; 101 L Ed 2d 80 (1988), the United States Supreme Court explained that peremptory challenges were partly designed for the purpose of removing taint from the jury:

> . . .we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. [*Ross*, 487 US at 88 (footnote and citations omitted).]

Defendant fails to show his trial counsel was ineffective because trial counsel effectively and properly used peremptory challenges to remove taint from the jury pool.

## VI. MOTION IN LIMINE FOR PHOTOGRAPHIC EVIDENCE

Here, defendant argues that the probative value of photographic evidence was substantially outweighed by unfair prejudice.

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

Defendant challenges the trial court's denial of his pretrial motion to limit the prosecution's admission of photographs and his trial counsel's decision not to renew the motion at trial. Defendant preserved the first challenge for appellate review, but not the second. A challenge to the admission of evidence is preserved when defendant objects in the trial court on the same grounds he asserts on appeal. MRE 103(a)(1). This issue was preserved by defendant's pretrial motion to exclude the evidence. Defendant preserves an ineffective

assistance of counsel claim by moving for a new trial or *Ginther*[6] hearing in the court below. *Sabin*, 242 Mich App at 658-659. Defendant's ineffective assistance of counsel claim is unpreserved because he took neither of these steps.

"The decision to admit or exclude photographs is within the sole discretion of the trial court." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909, mod 450 Mich 1212 (1995). We review for an abuse of discretion the trial court's decision on a motion to exclude evidence. *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Mahone*, 294 Mich App at 212.

Our review of defendant's ineffective assistance of counsel claim is limited to mistakes apparent on the record, because no *Ginther* hearing was held. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

## B. ANALYSIS

Defendant disputes the relevance and prejudicial effect of photographs of Chelsea's skeletal remains admitted at trial. Defendant filed a pretrial motion in limine to limit the presentation and amount of photographs admitted at trial. At the hearing on the motion, defendant conceded that the photographs bore some evidentiary value concerning Chelsea's injuries and the location of her body. Defendant's request was centered on showing the jury black and white photographs instead of color, and to limiting the prosecutor's intended presentation of "50 or 60 pictures." The prosecution agreed that the photographs were grizzly, but argued that they accurately depicted the body's condition and that defendant left the body exposed in the woods and to the elements. The court denied defendant's motion. It found that the motion was generic in that it did not challenge any particular photograph for a stated reason. It further found that the evidence was directly relevant to establishing defendant's count two, concealing the death of an individual. The court's decision was not an abuse of discretion.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence is generally admissible, MRE 402, and a relevant photograph will not be excluded solely because it is gruesome, *Gayheart*, 285 Mich App at 227. "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *Mills*, 450 Mich at 76. An example of the proper analysis was given in *People v Eddington*, 387 Mich 551; 198 NW2d 297 (1972). There, our Supreme Court explained:

> Photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of

---

[6] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. Generally, also, the fact that a photograph is more effective than an oral description, and to the extent calculated to excite passion and prejudice, does not render it inadmissible in evidence." [*Eddington*, 387 Mich at 562-563, quoting 29 Am Jur 2d, Evidence, § 787, pp 860-861.]

In *People v Mills*, our Supreme Court reversed this Court's holding that the probative value of 17 full color slides of the victim's burned body was substantially outweighed by the danger of unfair prejudice that the jury would "abdicate its truth-finding function" and base its verdict "on sympathy and passion." *Mills*, 450 Mich at 65. In *Mills*, the victim testified that after she tried to escape the backseat of a driving vehicle, one of the defendants dumped or threw gasoline all over her body, set her on fire, and she either fell, or was pushed from the vehicle. *Id*. at 64. The defendants argued that they were intoxicated and that the gasoline spilled by accident. *Id*. at 65. The Court found "that the photographs were important to understanding facts that were 'of consequence to the determination' of the defendants' guilt." *Id*. at 69. Specifically, they were relevant to establish the elements of the codefendants' assault to commit murder charge and to the credibility of the victim's version of events by showing "the 'splattering' of burns that [were] indicative that gasoline was thrown, not spilled on the victim." *Id*. at 78. The Court acknowledged that the photographs were graphic, but found that their probative value was not substantially outweighed by their possible prejudice. The Court noted that the photographs were "accurate factual representations of the injuries suffered" and were not "an enhanced or altered representation of the injuries." *Id*. at 77.

Similar to *Mills*, the photographs here were relevant to support the credibility of the witnesses' testimony and to establish the elements of one of the crimes charged. Of the 11 color photographs produced at trial, three shown the body in its wooded location covered with tree limbs and leaves. These photos were relevant to corroborate the witnesses' testimony regarding the condition and location of the body when found and to establish that the body was concealed, under MCL 333.2841(3). An additional eight photos were admitted during medical expert witness testimony to illustrate Chelsea's right and left skull fractures, teeth damage and jawbone fractures. Defendant argues that it was unnecessary for the court to admit the photographs during expert witness testimony because the medical examiner's testimony sufficiently described the body's condition. *Mills*, 450 Mich at 76. We disagree. The mere fact that a witness can orally testify about the information contained in the photographs is not a reason for their exclusion. Photographs can be used to corroborate a witness's testimony. *Id*. Further, "[t]he jury is not required to depend solely on the testimony of experts, but is entitled to view the severity and vastness of the injuries for itself." *Gayheart*, 285 Mich App at 227.

The probative value of the photographs was also not substantially outweighed by their possible prejudice. "Any relevant testimony will be damaging to some extent." *Sclafani v Peter S Cusimano, Inc*, 130 Mich App 728, 735; 344 NW2d 347 (1983). The major function of MRE 403 is to exclude evidence "of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect...." *Mills*, 450 Mich at 75 (citation omitted). In this case, the

cause of death was in dispute, where the prosecution argued blunt force trauma caused Chelsea's death and the defendant argued accidental asphyxiation. The photographs were probative to illustrate the extent of facial fractures that caused Chelsea's death. The photographs were also "accurate factual representations of the injuries suffered" and were not "an enhanced or altered representation of the injuries." *Id*. at 77.

For these reasons, the trial court did not abuse its discretion in denying defendant's motion to exclude the photographs from trial.

Defendant next argues trial counsel was ineffective for not renewing defendant's motion to exclude the photographs at trial. To establish an ineffective assistance claim, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness under professional norms and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different and the result that did occur was fundamentally unfair or unreliable." *Seals*, 285 Mich App at 17.

Defendant was not ineffective for not renewing defendant's motion in limine. Defendant's initial intent was to limit the amount of photographs presented and to have them introduced in black and white instead of color. While defendant did not succeed in having the photographs produced in black and white, the prosecution's preliminary offer of "50 to 60 pictures" was significantly reduced to only 11 at trial. Decisions regarding what evidence to present are presumed to be matters of trial strategy that this Court will not second-guess with the benefit of hindsight. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004) (citation omitted). Given that counsel's motion to exclude was denied pretrial and that counsel was successful in having the amount of photographs reduced, we find that counsel's decision not to renew the motion to exclude was reasonable trial strategy. Further, it is unlikely that the decision not to renew was outcome determinative where the photographs were otherwise admissible to corroborate witness testimony, show the location and condition of the body, and to establish the elements of one of the crimes charged.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Kirsten Frank Kelly
/s/ Jonathan Tukel