*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

RYAN ALLEN BERRY,

       Defendant-Appellant.

UNPUBLISHED
November 21, 2023

No. 361031
Muskegon Circuit Court
LC No. 2019-006130-FC

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Defendant was convicted by a jury of first-degree premeditated murder, MCL 750.316(1)(a), unlawful imprisonment, MCL 750.349b, and two counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life in prison without the possibility of parole for the murder conviction, 4 to 90 years' imprisonment for the unlawful-imprisonment conviction, and two years' imprisonment for each of the felony-firearm convictions. Defendant appeals by right, arguing that the trial court erred by denying his motion to suppress certain statements he made, that there was insufficient evidence to sustain the first-degree murder conviction, and that the court erred by rejecting his request to instruct the jury on voluntary manslaughter. We affirm.

## I. BACKGROUND

In February 2019, defendant and CA met at work and became close friends. In May 2019, CA moved into a rental home, and shortly thereafter defendant and another coworker moved into the home, joining CA as roommates. A relationship soon developed between CA and defendant. CA characterized the relationship as one of "friends with benefits" as opposed to a serious romantic relationship. CA testified that the relationship lasted about a month and that she ended it because she did not have the same strong feelings for defendant that he had for her. Defendant, on the other hand, testified that the couple were emotionally and romantically close and that CA's children called him "dad." There was audio evidence presented in which defendant stated that he was in love with CA. The evidence thus demonstrated that CA and defendant had two very

-1-

different perspectives about the nature of the relationship. Defendant did not want to move out of the home or end the relationship, and he subsequently began engaging in stalking-like behavior, tracking CA's movements and actions.

CA quit her job, based in part on the awkwardness of working with defendant. Defendant, however, believed that she quit her job because she was otherwise going to be fired for accumulating too many points for tardiness and missed days. In July 2019, after CA had ended the dating relationship with defendant, CA rekindled a romance from high school with the murder victim, Evan Yonker, and eventually moved into his home in early August 2019 after bouncing back and forth between the rental home she shared with defendant and Yonker's house. CA expressed that she was no longer comfortable living in the same house with defendant. Defendant remained in the rental home. CA told defendant that she and Yonker were simply friends and not romantically involved, that she was comforting Yonker through his divorce, and that she was not sleeping with Yonker. Defendant indicated that he did not believe her claims, and he became despondent, voicing suicidal threats over the failure of the perceived romance.

At some point before the murder on August 15, 2019, defendant and Yonker became embroiled in a verbal altercation at the rental home after CA and Yonker had gone to the house to retrieve CA's clothes. Defendant later apologized to Yonker for his behavior. CA had been consistently staying at Yonker's home for at least a week leading up to the homicide. According to defendant, just two days before he killed Yonker, and despite CA having broken off the relationship, defendant and CA had consensual sex.[1] CA still characterized defendant as a friend.

On August 14, 2019, defendant constantly texted CA, angrily demanding to know the nature of and details regarding the relationship between CA and Yonker. Around midnight, CA informed defendant that she had developed feelings for Yonker. CA went to bed, but defendant continued texting her. CA later responded, telling defendant that the relationship between her and Yonker was none of his business.

On the morning of August 15, 2019, CA was asleep in Yonker's bed at his home when she was startled awake by the presence of defendant looming over her with a knife. Yonker was not at home, having left for work for the day. According to CA, while Yonker typically returned home from work between 4:00 p.m. and 6:00 p.m., CA thought that he might return earlier that day because he had talked about quitting his job.

Defendant held CA captive, keeping her at bay with the knife and then a shotgun that Yonker kept in the home. Defendant knew beforehand that the shotgun was in Yonker's house.[2] Defendant testified that his plan was, at least in part, to commit suicide in front of CA with the shotgun to forever burden her with a guilty conscience. According to CA, defendant stated that

---

[1] Defendant testified about this sexual encounter, and during CA's testimony, she admitted that she and defendant may have had sex on one occasion after she had ended the relationship; however, it was before she began staying elsewhere.

[2] Defendant testified that the night before the murder, he had watched YouTube videos on how to use a shotgun.

he was going to kill all three of them—himself, CA, and Yonker. CA testified that defendant also spoke directly about killing Yonker and that defendant asked when Yonker would be returning home. CA indicated that within 30 to 60 minutes of defendant's arrival, Yonker returned to the home. Before Yonker arrived, CA told defendant that she indeed had been having sex with Yonker. Defendant testified as follows regarding his mindset upon hearing CA's admission:

> And I'll never forget like when she said that they were actually sleeping together, like how I felt. I was—It was like a hot flash and I just—I wanted to destroy just everything. I wanted to tear that bedroom apart with my bare hands, and I wanted to—I wanted to attack this guy and just—I wanted to kill him. And I pulled the knife out of my pocket and I walked over and I stabbed the bed because I'm just thinking like this is where they're having sex and they're—I don't know, and I stabbed the bed. And I turned around and I stabbed it into the dresser, and I'm just—I'm—I'm losing control.

Defendant testified that he was able to control himself from breaking things in the house because "that's not what [he] wanted to do"—what he wanted to do was kill Yonker. Defendant explained, however, that he had not been expecting Yonker anytime soon, that he had not planned on waiting for Yonker, that he believed that he would have plenty of time to talk to CA and get her to admit to having an intimate relationship with Yonker, and that he would then kill himself and make CA watch.

According to defendant, when Yonker was in the process of entering the home, defendant first believed that the police had arrived and he planned on forcing the officers to shoot him. But CA realized that it was Yonker. And, although she called out to him not to enter, he came inside. Defendant then saw that it was Yonker, and with the intent to kill, as defendant himself conceded, he shot Yonker with the shotgun, killing him. CA witnessed the shooting, noting that defendant shot Yonker from a distance of approximately six feet. Defendant contended that after CA told him that she and Yonker had had sex, he had yet to calm down when he observed and then shot Yonker. Defendant maintained that he could not control his actions.

Defendant, after CA first talked him out of burning down Yonker's house, forced CA to drive him to Grand Haven State Park on Lake Michigan. At some point during the drive, defendant threw the shotgun out of the car.[3] CA did not know what defendant did with the knife. When they arrived at the park, defendant got out of the vehicle, apologized to CA for his actions, and then headed to the lake. CA stayed in the car and called the police.

Defendant stripped down to his underwear and entered Lake Michigan, ostensibly to drown himself. At the time, the Ottawa County Sheriff's Department happened to have two dive boats in the water at the park for purposes of dive team training. Upon hearing that a suicidal person was in the water, the boats, carrying several officers, were diverted to defendant's precise location in the lake. Because the officers were advised that defendant was possibly armed and may have been involved in a shooting, the police initially pointed a gun at defendant. Defendant told the

---

[3] The police later located and secured the gun.

officers that he had a knife. After about three to four minutes, the police concluded that defendant was unarmed, and the drawn gun was holstered.

The officers began speaking to defendant in an effort to build a rapport with him, talk him out of committing suicide, downplay whatever he had done, put a positive spin on matters, and to coax him out of the water. During the conversation between defendant and the officers, defendant stated that he had shot someone in the chest. Defendant rejected the officers' attempts to throw him a life ring buoy. Eventually, defendant, cold and exhausted, climbed into one of the dive boats and gave himself up. He had been in the water, which was around 55 degrees, for about 75 to 90 minutes.

Defendant was then taken by ambulance to the hospital. During the transport, defendant was accompanied by a paramedic and a police officer. The officer testified that he made small talk with defendant, trying to comfort him and prevent any situation from developing in the back of the ambulance. During the conversation, defendant volunteered that he shot and killed Yonker and that he had told CA that he was going to kill Yonker. The officer asserted that he did not interview defendant. We have listened to an audiotape of the conversation between the officer and defendant during the ambulance ride, and the officer's characterization of the conversation is accurate. Defendant essentially launched into a volunteered narrative of the events leading up to and including the shooting. Defendant's admissions while in the water and the ambulance were made absent any *Miranda*[4] warnings.

Defendant was later formally interviewed at the police station after being fully Mirandized. According to the interrogating detective, defendant admitted to killing Yonker. The detective testified that defendant indicated that he watched a YouTube video the night before the shooting to learn how to load the shotgun and that he wanted to be well rested so that he could harm Yonker the next day. Defendant told the detective that he believed that Yonker would return home around 4:00 p.m. and that he had been willing to wait at the house until then. The detective also testified that defendant acknowledged that his plan was to shoot and kill Yonker and then himself. Defendant wanted to get back at CA, and he was glad that Yonker was dead.

Before trial, defendant moved to suppress the un-Mirandized statements that he made to officers while he was in Lake Michigan and the ambulance, arguing that they were the result of custodial interrogations, and thus, made in violation of *Miranda*. The trial court denied the motion, concluding that while defendant was effectively in custody in both instances, there was no "interrogation" when defendant was in the water and the ambulance. The trial court further ruled that even if the police officers "interrogated" defendant when he was in Lake Michigan, the public-safety exception to *Miranda* was implicated because the location of the knife was unknown and there was a danger posed to the officers, persons on the beach, and to defendant himself.

At the conclusion of the proofs, defendant requested an instruction on voluntary manslaughter. The trial court declined to so instruct the jury, ruling that a rational view of the evidence did not support an instruction on voluntary manslaughter. Although the trial court's

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

reasoning is a bit unclear, the court appeared to determine that defendant's own testimony indicated that he had cooled down by the time of the shooting and that he had not killed Yonker in the heat of passion. The trial court did instruct the jurors on second-degree murder.

Defendant was convicted and sentenced as indicated earlier, and he now appeals the convictions by right.

## II. ANALYSIS

## A. ADMISSIBILITY OF DEFENDANT'S STATEMENTS

Defendant argues that he was the subject of a custodial interrogation while treading water in Lake Michigan; therefore, his statements made to officers while he was in the water should have been suppressed because he had not been given his *Miranda* warnings beforehand. Defendant further contends that the *Miranda* violation in relation to his statements made in the lake tainted the subsequent statements that he made in the ambulance and later at the police station. Defendant maintains that the trial court erred by finding that no interrogation occurred when defendant was in the water and the ambulance and by ruling that the public-safety exception to *Miranda* applied. We hold that defendant was not "interrogated" when in the water or the ambulance for purposes of *Miranda* analysis and that even if we determined a *Miranda* violation occurred, it was harmless beyond a reasonable doubt. We find it unnecessary to answer whether the public-safety exception to *Miranda*, created in *New York v Quarles*, 467 US 649, 656-658; 104 S Ct 2626; 81 L Ed 2d 550 (1984), applied to the instant case, although in footnote 5, *infra*, we touch on the subject.

This Court reviews for clear error a trial court's factual findings made in connection with a ruling on a motion to suppress a statement. *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Id.* The question whether an individual was subject to custodial interrogation, and thus entitled to *Miranda* warnings, is a mixed question of law and fact; this Court reviews the trial court's findings of fact for clear error but reviews questions of law de novo. *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001). Factual findings will only be disturbed if this Court is left with "a definite and firm conviction that a mistake was made." *People v Brown*, 279 Mich App 116, 127; 755 NW2d 664 (2008).

In *Attebury*, 463 Mich at 668-669, our Supreme Court discussed *Miranda*, observing:

In its landmark *Miranda* decision, the United States Supreme Court announced the general rule that the prosecution in a criminal case may not use a statement stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. As a basis for the rule, the *Miranda* Court explained that in order to effectively combat the inherently compelling pressures of custodial interrogation, an accused must be adequately and effectively apprised of rights associated with the interrogation. In the years since *Miranda*, the United States Supreme Court has repeatedly described the required advice of rights as being a "prophylactic" measure designed to protect the exercise of an accused's Fifth

-5-

Amendment rights. See *Dickerson v United States*, 530 US 428, 438 n 2; 120 S Ct 2326; 147 L Ed 2d 405 (2000). Although some of these decisions . . . might have been read to suggest that *Miranda* warnings are not constitutionally required, the Court has recently confirmed that the *Miranda* decision "announced a constitutional rule." *Dickerson*, [530 US] at 444. [Quotation marks and citations omitted.]

In *People v Anderson*, 209 Mich App 527, 532; 531 NW2d 780 (1995), this Court focused on the "custodial interrogation" component of any analysis under *Miranda*:

> The critical issue to be resolved is whether there was a custodial interrogation to trigger the requirements of *Miranda*. It is now axiomatic that *Miranda* warnings need only be given in cases involving custodial interrogations. Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody. As the Supreme Court has explained, however, *volunteered statements of any kind are not barred by the Fifth Amendment and are admissible*. Thus, the procedural safeguards outlined in *Miranda* are required where the suspect is in custody and is subjected to interrogation. Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. [Quotation marks and citations omitted; emphasis added.]

"Interrogation refers to express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997).

With respect to defendant's statements that were made when he was in Lake Michigan, it is patently clear to us that the sole focus of the police officers' communications with defendant was on safely coaxing defendant out of the cold water and preventing him from committing suicide. The officers did not expressly question defendant as in a standard interrogation, nor did they engage in any effort to employ words or actions reasonably likely to elicit incriminating responses. Indeed, the thought of the police shouting out to defendant his *Miranda* rights under the circumstances seems ludicrous.[5] In regard to defendant's statements made while in the ambulance, they were plainly volunteered by defendant without prompting from the accompanying

---

[5] In *United States v Webb*, 755 F2d 382, 392 n 14 (CA 5, 1985), the Fifth Circuit of the United States Court of Appeals expressed sentiments comparable to our thoughts here:

> We need not decide whether [the public-safety] exception to *Miranda* applies in the instant case because we conclude Webb was not interrogated. We note, however, that Webb's safety was of primary concern to the negotiators, and the negotiators primary purpose of preventing Webb's threatened suicide presents an analogous situation to *Quarles*. This Court is reluctant to force a choice between *Miranda* and the neutralizing of a crisis situation created by Webb's suicide threats.

officer. Because there was no "interrogation" when defendant was in the lake and the ambulance, the statements or interactions associated with either or both of those locations did not taint his Mirandized statements elicited at the police station.[6]

Furthermore, we conclude that even if there were *Miranda* violations in relation to defendant's statements made when he was in the lake and the ambulance, they were harmless beyond a reasonable doubt. The admission of evidence in violation of *Miranda* does not require reversal if it was harmless beyond a reasonable doubt. *People v Whitehead*, 238 Mich App 1, 8-12; 604 NW2d 737 (1999); *People v Grevious*, 119 Mich App 403, 408; 327 NW2d 72 (1982). "If there was overwhelming admissible evidence against defendant, erroneous admission of evidence of statements obtained in violation of *Miranda* can fairly be characterized as harmless beyond a reasonable doubt." *Grevious*, 119 Mich App at 408. In this case, CA's testimony, defendant's Mirandized statements made at the police station, and defendant's own trial testimony largely tracked the un-Mirandized statements regarding the events that occurred before, during, and after the homicide and overwhelmingly established the crime of first-degree premeditated murder.[7] The statements made by defendant in the water and the ambulance essentially constituted cumulative evidence. Reversal is unwarranted.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence was insufficient to support the conviction of first-degree murder because the prosecution failed to elicit testimony demonstrating adequate time for

---

[6] In support of defendant's argument that the officers' interrogation of him while in the water tainted the Mirandized statements made at the police station, defendant relies on *Missouri v Seibert*, 542 US 600, 604; 124 S Ct 2601; 159 L Ed 2d 643 (2004), in which the Court held:

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda*, the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible. [Citation omitted.]

Assuming that the conversation in the water constituted a custodial interrogation, in no form or manner did the subsequent interrogation at the police station, considered in conjunction with the communications in Lake Michigan, equate to the circumstances addressed in *Seibert*. The police station interrogation was not tainted.

[7] Defendant's former girlfriend SR also testified that she called defendant as he and CA were driving to the park after SR saw some concerning online postings. Defendant told her that he shot Yonker. Defendant confirmed that this conversation occurred.

premation and deliberation.  In *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020), this Court articulated the well-established principles that govern our review of a sufficiency argument:

> This Court reviews de novo whether there was sufficient evidence to support a conviction.  In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses.  Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime.  The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant.  All conflicts in the evidence must be resolved in favor of the prosecution.  [Quotation marks and citations omitted.]

Accordingly, the "reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

To convict a defendant of first-degree premeditated murder, the prosecution must prove that the defendant caused the death of the victim, that the defendant intended to kill the victim (malice), that the intent to kill was premeditated and deliberate, and that the killing was not justified or excused, if at issue.  MCL 750.316(1)(a); *People v Mendoza*, 468 Mich 527, 533-534; 664 NW2d 685 (2003); *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998); M Crim JI 16.1.  Premeditation means to think about something beforehand, while deliberation means to measure and evaluate the facets of a choice or problem.  *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998).  In *People v Oros*, 502 Mich 229, 242-243; 917 NW2d 559 (2018), our Supreme Court further explained the elements of premeditation and deliberation:

> Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a "second look." That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look.  While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds.  By the weight of authority the deliberation essential to establish murder in the first degree need not have existed for any particular length of time before the killing.  The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement.  The question of deliberation, when all the circumstances appear, is one of plain common sense; and

an intelligent jury can seldom be at a loss to determine it. [Quotation marks, citations, and brackets omitted.[8]]

Premeditation and deliberation can be inferred from the circumstances surrounding a killing, and "[m]inimal circumstantial evidence is sufficient to prove an actor's state of mind." *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2002).

The prosecution presented evidence that defendant developed the plan to shoot Yonker the night before the murder, which entailed watching YouTube videos on how to load and use a shotgun and getting a good night's rest, and that defendant told CA when he arrived at Yonker's house on August 15, 2019, that he intended to kill Yonker. Moreover, defendant himself testified that after CA told him that she and Yonker had been having sex, he was driven to shoot and kill Yonker. Additionally, defendant wielded a knife at Yonker's home, and CA testified that it appeared to be a knife from the rental home that defendant had brought with him, which, as with the evidence of defendant educating himself on the use of a shotgun, constituted evidence demonstrating a significant lapse of time between defendant's initial homicidal thoughts and the ultimate killing. When viewed in a light most favorable to the prosecution, and resolving all conflicts in the evidence in favor of the prosecution, there was more than sufficient evidence to establish the elements of premeditation and deliberation. There was adequate time for defendant to take a "second look." This is true even were we to assume that he first formulated the plan to kill Yonker right after CA told him about her sexual relationship with Yonker.

Defendant argues that no one expected Yonker to return home on the morning of the murder, and defendant seems to suggest that there could be no premeditation and deliberation because he did not even realize that it was Yonker entering the home when or just before he discharged the shotgun. This argument ignores the evidence that defendant had already made a measured decision beforehand to shoot Yonker before he even returned home. The fact that Yonker's arrival home came quicker than expected and that defendant did not realize that it was Yonker until the last moment did not somehow alter defendant's state of mind and his decision to kill Yonker.

Again, the jury was in the best position to determine the credibility of the testimony and resolve any conflicts. Viewing the evidence presented in the light most favorable to the prosecution, there was sufficient evidence to support its verdict.

## C. INSTRUCTION ON VOLUNTARY MANSLAUGHTER

Defendant argues that he was denied his due process right to present a defense when the trial court refused to instruct the jury on the offense of voluntary manslaughter even though a

---

[8] "Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Plummer*, 229 Mich App at 300.

rational view of the evidence supported defendant's request for the instruction. In *People v Everett*, 318 Mich App 511, 528-529; 899 NW2d 94 (2017), this Court observed:

> We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion. Even when instructional error occurs, reversal is warranted only if after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative. The defendant bears the burden of establishing that the error undermined the reliability of the verdict. [Quotation marks, citations, and brackets omitted.]

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him. Accordingly, jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *Id.* at 527 (quotation marks and citations omitted).

In *People v Yeager*, 511 Mich 478, 489; ___ NW2d ___ (2023), the Michigan Supreme Court addressed the crime of voluntary manslaughter:

> [F]or an act to be considered voluntary manslaughter, the defendant must kill in the heat of passion, the passion must be caused by adequate provocation, and there cannot be a lapse of time during which a reasonable person could control their passions. The provocation must be sufficient to cause the defendant to act out of passion rather than reason, but it also must be sufficient to cause a reasonable person to lose control, not just the specific defendant. [Citation omitted.]

Manslaughter is a lesser included offense of murder, and the distinguishing element is malice, which in voluntary manslaughter is negated by the presence of provocation and heat of passion. *Id.* at 489-490. When a defendant is charged with murder, the court must instruct the jury on voluntary manslaughter if supported by a rational view of the evidence. *Id.* at 490.

We conclude as a matter of law that the provocation asserted by defendant—being told by CA that she had sex with Yonker—was not sufficient to cause a reasonable person to lose control and kill another, even assuming that a rational view of the evidence lent some support for all of the remaining criteria necessary to establish voluntary manslaughter. Therefore, the trial court did not err by denying defendant's request for a voluntary-manslaughter instruction.[9] We further hold that any presumed error by the court in failing to instruct the jury on voluntary manslaughter was harmless and did not prejudice defendant.

This is not a situation involving a married man hearing that his wife is having a sexual relationship with another man, or one in which a significant other in a long-term relationship is

---

[9] We will affirm a trial court's ruling when that court reaches the right result, albeit for the wrong reason. *People v Meeker*, 340 Mich App 559, 569; 986 NW2d 622 (2022).

told of an affair, or even a situation wherein a person is informed of a sexual dalliance in the context of a short, *ongoing* relationship.[10]  In this case, at the time of the murder and defendant's discovery that Yonker and CA had engaged in sexual relations, defendant had known CA for all of six months, they had been in a boyfriend-girlfriend relationship for only about a month, and CA had ended the relationship and moved in with another man.  Moreover, this case did not involve defendant catching CA and Yonker *in flagrante delicto*, which would have posed a more incendiary circumstance.[11]

Our ruling is supported by our Supreme Court's opinion in *People v Pouncey*, 437 Mich 382; 471 NW2d 346 (1991).  "Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter.  The law cannot countenance the loss of self-control; rather, it must encourage people to control their passions." *Id.* at 389.  The *Pouncey* Court noted:

> If reasonableness were not required, a man who flew into a rage and killed a woman for refusing to have sex with him would be guilty of nothing more than manslaughter.  Furthermore, when the law rewards irrational behavior, it encourages people to feign irrationality.  Thus, if the man in the above hypothetical had coolly decided to kill the woman as punishment for her refusal, he would be encouraged to feign rage in order to mitigate his crime.  [*Id.* at 389 n 7 (quotation marks and citation omitted).]

We do need to address a procedural aspect of our holding that varies from the standard "reasonable person" analysis in the context of an asserted voluntary-manslaughter defense.  In *Pouncey*, *id.* at 390, the Supreme Court stated:

> The determination of what is reasonable provocation is a question of fact for the factfinder.  However, the judge does play a substantial role.  The judge furnishes the standard of what constitutes adequate provocation, i.e., that provocation which would cause a reasonable person to act out of passion rather than

---

[10] In *People v Pouncey*, 437 Mich 382, 391; 471 NW2d 346 (1991), our Supreme Court discussed whether "words" can serve as adequate provocation for purposes of voluntary manslaughter:

> [T]he claimed provocation in this case consists only of words, which other courts generally have held do not constitute adequate provocation, and in some instances words alone did not even justify an assault and battery.  However, words of an informative nature, rather than mere insults, have been considered adequate provocation.  But this is not such a case, for this case involves insulting words, not words of an informational character.  Nonetheless, we decline to issue a rule that insulting words per se are never adequate provocation. . . . .  [Citations omitted.]

[11] "It is the law practically everywhere that a husband who discovers his wife in the act of committing adultery is reasonably provoked, so that when, in his passion, he intentionally kills either his wife or her lover (or both), his crime is voluntary manslaughter rather than murder."  2 LaFave, Substantive Criminal Law (3d ed), § 15.2(b)(5).

-11-

reason. When, as a matter of law, no reasonable jury could find that the provocation was adequate, the judge may exclude evidence of the provocation.

In this case, there was no exclusion of evidence, but we conclude that if a court has the authority to preclude a "defense" of voluntary manslaughter as a matter of law by excluding evidence of provocation on the basis that the purported provocation was not sufficient to cause a reasonable person to lose control, a court certainly has the equivalent authority to refuse to instruct a jury on voluntary manslaughter for the same reason even if some provocation evidence was presented to the jury. A rational view of the evidence simply did not support an instruction on voluntary manslaughter because, as a matter of law, a reasonable person would not have lost control as defendant did under the circumstances presented.

Finally, assuming an instructional error, we conclude that it was harmless because it was not outcome determinative and did not undermine the reliability of the verdict. See *Everett*, 318 Mich App at 528-529. We do not in any manner base this ruling on the fact that the jury did not find defendant guilty of second-degree murder. See *Yeager*, 511 Mich at 494-495 (reversing this Court's determination that the defendant could not establish prejudice because "any error in failing to instruct the jury on voluntary manslaughter was harmless given that the jury rejected a verdict of second-degree murder in favor of a first-degree murder conviction"). Rather, we conclude that any assumed error was harmless because there was overwhelming evidence, discussed earlier, that defendant was guilty of first-degree premeditated murder. Moreover, we cannot fathom that the jury, had it been presented with the issue, would have found that the asserted provocation was sufficient to cause a reasonable person to lose control.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michelle M. Rick

-12-